# EXHIBIT 8

**Translation No. I-54727**
**Book No. 657**
**Page 162**



Sandra Regina Mattos Rudzit

TRADUTORA PÚBLICA

---

*I, Sandra Regina Mattos Rudzit, certified public translator, duly admitted and sworn by the Commercial Registry of the State of São Paulo, Brazil, hereby certify that a copy of a document was submitted to me, written in Portuguese, the translation of which is as follows:*

### PRIVATE AGREEMENT OF FIDUCIARY ASSIGNMENT OF CREDIT RIGHTS (CREDIT AND DEBIT CARD RECEIVABLES) No. 0041049965

## I - PREAMBLE:

(illegible)

**|x| Itaú Unibanco S.A.**, a Brazilian financial institution, acting individually or by any of its branches, offices and premises, in Brazil or abroad, with its principal place of business at Praça Alfredo Egydio de Souza Aranha, No. 100 - Olavo Setúbal Tower, São Paulo - SP, Corporate Taxpayer's Register (CNPJ) No. 60.701.190/0001-04, hereinafter referred to as **Itaú Unibanco;**

**| | Banco Itaucard S.A.**, with its principal place of business at Alameda Pedro Calil, 43, Poá, São Paulo, CNPJ No. 17.192.451/0001-70, hereinafter referred to as **Banco Itaucard;**

**| | Banco Itauleasing S.A.**, with its principal place of business at Av. Antonio Massa, 361 - Centro - Poá/SP, CNPJ No. 49.925.225/0001-48, hereinafter referred to as **Banco Itauleasing.**

It being understood that **Itaú Unibanco, Banco Itaucard** and **Banco Itauleasing** shall be jointly referred to as "ASSIGNEES" and individually, ASSIGNEE.

(illegible)

## RAKUTEN BRASIL FINANCIAL SERVI

AV FRANCISCO MATARAZZO, 1500 - POSTAL CODE: 05001 - 100 - SAO PAULO/SP

CNPJ: 22.366.799/0001-77

(illegible)

## RAKUTEN BRASIL FINANCIAL SERVI

AV FRANCISCO MATARAZZO, 1500 - POSTAL CODE: 05001 - 100 - SAO PAULO/SP

CNPJ: 22.366.799/0001-77

(illegible)

## BRANDS:

( ) MasterCard, MasterCard Maestro, Diners Club International, Redeshop and other brands processed by the ACQUIRERS that are informed by it.

(X) Visa, VisaElectron and other brands processed by the ACQUIRERS that are informed by it.

(X) Hiper and other brands processed by the ACQUIRERS that are informed by it.

( ) and other brands processed by the ACQUIRERS that are informed by it.

(illegible)

Throughout the term of effectiveness of this fiduciary assignment guarantee, the ASSIGNOR(S) and the DEBTOR(S) agree(s) to keep the guarantee amount equivalent to at least:

(X) 100% of the sum of the amounts of principal plus accessories of the Secured Obligations*.

( ) R$ ( )

( ) XXXXXX percent (XXXXX %) of the sum of the amounts of principal plus accessories of the Secured Obligations OR XXXXX *Reais* (R$ XXXXXX) to be calculated considering the amounts assessed in the Fiduciary Assignment Instrument No. XXX, entered into on XXX between XXXX and

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688 - CPF 082.060.███08 - RG 8.222 837-1
Rua Matias Aires, 402 - 5° andar, cj. 51 - 01309-020 - São Paulo - SP - Brasil - Fone/Fax: 55-11-3155-7383 - e-mail: just@just.trd.br - www.just.trd.br

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.                                    Página 1 de 55

Translation No. I-54727
Book No. 657
Page 163



Sandra Regina Mattos Rudzit

TRADUTORA PÚBLICA

XXXX

( ) Others:

(*) in case there are obligations in foreign currency, the conversion thereof shall be made in accordance with the provisions of <u>Exhibit III</u>.

The assessment of the Credit Rights shall consider the following:

( ) Flow

(x) Schedule

(illegible)

Frequency:

If it is a Flow, it occurs monthly, upon totalization of the CREDIT RIGHTS (which pass through the ESCROW ACCOUNT(S) in the frequency set forth above.

If it is a Schedule, it occurs daily, upon totalization of the CREDIT RIGHTS performed, both those credited to an escrow account and those performed and still not received by the FIDUCIARY ASSIGNOR(S), still not received by the FIDUCIARY ASSIGNOR(S) (i.e., credit rights owned by the FIDUCIARY ASSIGNOR(S) (resulting from sales made only with the credit cards, but still not settled by the ACQUIRERS to the FIDUCIARY ASSIGNOR(S) in the respective ESCROW ACCOUNT(S), hereinafter referred to as "CREDIT RIGHTS").

(illegible)

The funds resulting from settlement of the CREDIT RIGHTS shall be transferred from the ESCROW ACCOUNT(S) to the respective CHECKING ACCOUNT(S) within one (1) business day as from receipt thereof, subject to the provisions of the Section "Escrow Account and Checking Account" of this Fiduciary Assignment, provided the secured obligation is not overdue and there is an excess guarantee above the minimum percentage set forth in this preamble.

(illegible)

| Holder | Bank | Branch | Number |
|---|---|---|---|
| RAKUTEN    BRASIL FINANCIAL SERVI | 341 | ███ | 15███ |

(illegible)

| Holder | Bank | Branch | Number |
|---|---|---|---|
| RAKUTEN    BRASIL FINANCIAL SERVI | 341 | ███ | 09███ |

(illegible)

The entirety of the obligations, as duly adjusted and increased by all charges assumed by DEBTOR(S) resulting from the transaction(s) described in <u>Exhibit II</u>, which may be supplemented, amended, ratified or rectified at any time.

## II - <u>SECTIONS</u>

<u>**The Fiduciary Assignment**</u> - By means of this Private Agreement of Fiduciary Assignment of Credit Rights ("Fiduciary Assignment"), in guarantee of all Secured Obligations undertaken by the DEBTOR(S) with the CREDITOR(S), including, but not limited to, any amendments to and extensions of the principal and accessory obligations, including default, whether present or future, assumed or to be assumed by the DEBTOR(S), ASSIGNOR(S) assigns and transfers to CREDITOR(S), irrevocably and irreversibly, by means of a fiduciary assignment, pursuant to article 66-B of Law 4.728/65 and other applicable legislation, fiduciary ownership, terminable ownership and indirect possession of the securities and other documents representing the Credit Rights described in

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060.███.08- RG 8.222 837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just trd br- www.just.trd.br



the preamble of this instrument.

**Sole Paragraph -** The transfer of fiduciary ownership of the Credit Rights by ASSIGNOR(S) to CREDITOR(S) shall remain in force until the full compliance with the Secured Obligations, and it shall be clear that its partial compliance will not imply the proportional exemption of the Fiduciary Assignment.

<u>Credit Rights</u> - The guarantee hereby created is composed of present or future (sic), held by the ASSIGNOR(S) against any acquirers that participate in the Card Guarantee Control System - SCG ("Acquirers") and in the Interbank Payment Chamber - CIP, resulting from acquisitions of goods or services supplied and/or provided by the ASSIGNOR(S) and paid by the buyers upon use of the credit and/or debit cards of the brands defined below, in the respective CNPJs of the ASSIGNOR(S), as listed in the Authorization (defined in the Section "Credit Rights") issued to each of the ASSIGNOR(S), and the Receivables credited to the Escrow Account(s), including any and all funds credited therein.

**Paragraph One -** The credit rights resulting from the Receivables, including those relating to advance payment of future credits held by the ASSIGNOR(S) against the Acquirers, shall be credited by the Acquirers exclusively to the Escrow Account(s), as a result of the adhesion by the ASSIGNOR(S) to the Acquirer Agreement and Adhesion of Establishment to the System of each Acquirer ("Acquirer Agreement") and to the provisions of the "Authorization for Change and Maintenance of Banking Domicile", issued for each of the ASSIGNOR(S) ("Authorization"), delivered, on the date hereof, to the CREDITOR(S), with a description of the brands and of the respective authorized CNPJs for their domiciles to be kept with the CREDITOR(S) and the form is attached hereto as <u>Exhibit I</u> (exhibit and integral part hereof, which shall be amended/substituted, and also annotated/registered with the competent registry office).

**Paragraph Two** – The Escrow Account(s), for all purposes and effects of this Fiduciary Assignment, of the Acquirer Agreement and of the Authorization(s), shall become the respective banking domicile(s) of the ASSIGNOR(S) ("Banking Domicile(s))".

**Paragraph Three** – The Receivables directly received from the Acquirers by the ASSIGNOR(S) shall be deemed the fiduciary and terminable ownership of the CREDITOR(S), and they do not become the property of the ASSIGNOR(S). The ASSIGNOR(S) shall be deemed mere holder(s) of these amounts, and it(they) is(are) required to transfer them to its(their) respective Escrow Account(s) immediately after receipt thereof.

**Paragraph Four** – In case there is no further outstanding balance, be it due to termination of the agreed Secured Obligations or for any other reason, the **FIDUCIARY ASSIGNOR(S)** may request the unlocking of the receivables and their consequent release, which shall be made within three (3) business days as from the date of the request.

<u>Escrow Account and Checking Account</u> - The proceeds of collection of the Receivables shall be credited to the respective Escrow Account(s), as set forth in the Preamble hereof.

**Paragraph One** - The Escrow Account(s) shall be transacted exclusively by the CREDITOR(S), aiming at the management of resources received as a result of this guarantee, and the CREDITOR(S) make withdrawals, apply, debit amounts and redeem the funds maintained in the Escrow Account, always and at any time, in accordance with the terms and conditions established in this Fiduciary Assignment and in the "Escrow Deposit Account Terms and Conditions", which document governs the conditions for opening and using the Escrow Account and which is registered with the 7th Registry of Deeds and Documents and Civil Registry Office of the Capital of the State of São Paulo, under No. 1.814.492.

**Paragraph Two** - While the DEBTOR(s) and the ASSIGNOR(S) are current with the Secured Obligations and the other obligations assumed in this Fiduciary Assignment, CREDITOR(S) shall transfer all the resources deposited in the Escrow Account(s) to the Checking Account(s) within the term set forth in the Preamble hereof.

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060.███-08- RG 8.222 837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just trd br- www.just.trd.br

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.                                                      Página 3 de 55



## Advance

In case the ASSIGNOR(S) advance(s) the receivables that are the subject matter of this guarantee, pursuant to the provisions of the regulations of the Central Bank - BACEN, the receivables may be withheld for up to two (2) business days. After this term, the CREDITOR(S) may, at its(their) discretion: (i) use the product of the advance to amortize the outstanding balance of the credit transaction or (ii) release it to the end user.

**Paragraph One** - If, due to the advance set forth in the preceding paragraph, the CREDITOR(S) understand(s), at its(their) sole discretion, that there is a potential deterioration of the credit risk of the secured transactions, or a relevant change in the economic and financial conditions of the ASSIGNOR(S) or of the DEBTOR(S) so as to jeopardize compliance with the secured obligations, the amounts resulting from the advance shall be used to settle the secured obligations, wholly or in part.

**Paragraph Two** – The payment of the early settlement shall consist in the amount of principal and non-amortized interest, adjusted until the date of the early settlement, based on the charges agreed in the instrument of the secured obligations, also increased by indemnification for early settlement and any taxes levied.

**Paragraph Three** – The indemnification for early settlement shall be obtained by the positive difference, if any, between (i) the present value of the flow of payments of principal and interest coming due, calculated by means of the discount of the flow set forth in the secured obligations, based on the interest rate in effect for the investment of the same amount during the period between the date of the early settlement and the maturity dates originally agreed in the secured transactions, originally agreed in the secured obligations and (ii) principal amount and non-amortized interest until the date of the early settlement, based on the charges agreed in the instrument of the secured obligations.

**Guarantee Ratio** – Throughout the term of effectiveness of the Fiduciary Assignment, the amount of the Credit Rights shall represent at least the Minimum Percentage of Guarantee defined in the preamble hereof.

**Paragraph One** – The Minimum Percentage of Guarantee shall be assessed in accordance with the conditions defined in the preamble, by means of: (i) the sum of the total funds that pass through the Escrow Account(s) during the Assessment Frequency (modality of assessment that will be above and hereinafter simply referred to as "Flow"); or (ii) the sum of the total Receivables resulting from sales made only with the credit cards, i.e., credit rights held by the ASSIGNOR(S), but still not settled by the Acquirers in the respective Escrow Account(s) (modality of assessment that shall be before and hereinafter simply referred to as "Schedule".

**Paragraph Two** – Whenever it is established that the Minimum Percentage of Guarantee shall be assessed in accordance with the Schedule modality (as selected in the Preamble hereof), the CREDITOR(S) shall be granted, in order to enable the control of the amount of the Receivables, access to the system(s) provided by the Acquirers or other form accessible by the CREDITOR(S), it being understood that in the event of impossibility of access, by the CREDITOR(S), to the system(s) of the Acquirers responsible for payment of the Receivables, the ASSIGNOR(S) agree(s) to provide the CREDITOR(S), in the Assessment Frequency, with an electronic spreadsheet containing a list of all performed Receivables scheduled for receipt.

**Paragraph Three** – The advance of amounts that are the subject matter of this guarantee, made in accordance with the provisions of the regulation of the Central Bank - BACEN and in accordance with the provisions of the section Advance hereof **shall neither** adversely affect the assessment of the minimum percentage of guarantee nor represent any waiver of the conditions of acceleration of maturity or tolerance in relation to the default, even if the creditor decides, out of mere liberality, to amortize the outstanding balance of the transaction as provided in paragraphs two and three of the section Advance.

**Statements** - Notwithstanding the other provisions of this Fiduciary Assignment, the ASSIGNOR(S), hereby and until the expiration of this Fiduciary Assignment, assumes the following obligations and make the following statements, whose veracity is a condition and essential cause for the execution of

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060.␣␣␣08- RG 8.222 837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just.trd.br- www.just.trd.br

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.                    Página 4 de 55



Translation No. I-54727
Book No. 657
Page 166

this Fiduciary Assignment by the CREDITOR(S):

**a)** the ASSIGNOR(S) is(are) the legitimate owner(s) of the Credit Rights, which are exempt from any liens, sale, alienation, security, levy of execution, charges or liens of any nature, legal or contractual, except for that arising from this Fiduciary Assignment;

**b)** ASSIGNOR(S) are duly authorized to execute this Fiduciary Assignment and to comply with all the obligations set forth herein, and all legal and statutory requirements necessary for the present engagement have been met;

**c)** the ASSIGNOR(S) and DEBTOR(S) shall take all acts and sign any documents necessary for the maintenance of this Fiduciary Assignment, as well as present to CREDITOR(S) this Fiduciary Assignment and its exhibits and amendments duly registered with the Registry(ies) Deeds and Documents located at the head office of ASSIGNOR(S) and DEBTOR(S) within up to ten (10) days as from execution of the instrument, or within another term negotiated with the CREDITOR;

**d)** the ASSIGNOR(S) shall reinforce, substitute, replace or complement this guarantee, assigning new rights of the same nature and with the same conditions as the Receivables, with other guarantees at the discretion of the CREDITOR(S) in the term requested in this regard, in case the amount of the Credit Rights becomes lower than the Minimum Percentage of the Guarantee, or if they are subject of or threatened with the levy of execution, seizure, provisional attachment or any other judicial or administrative measure, or if they suffer depreciation, deterioration, devaluation, disorder, or become unsuitable, improper, useless or insufficient to ensure compliance with the principal and accessory obligations of DEBTOR(S), arising from Secured Obligations;

**e)** the ASSIGNOR(S) agree(s) not to assign, transfer, waive, encumber, lease, grant usufruct or free lease, change, terminate or encumber or otherwise convey or dispose of its(their) respective Banking Domicile(s), not to substitute any of the Acquirers for other acquirer companies that are not registered with the CIP, not to advance any Receivables with the Acquirers, nor to permit the amendment to any clause or condition of the respective checking account opening agreement or of the Acquirer Agreement, nor to perform any act or refrain from performing any act that may in any way result in the change, closing or encumbrance of its Banking Domicile(s), or in the express or tacit amendment to the respective checking account opening agreement or to the Acquirer Agreement, without the prior and express consent of the CREDITOR(S);

**f)** the ASSIGNOR(S) authorize(s) the CREDITOR(S) to request the CIP to maintain its(their) respective Banking Domicile(s) to receive the Receivables until the settlement of all obligations originating from the Secured Obligations, as well as to adopt all necessary measures with the CIP and other Acquirers for compliance with the Authorization(s); and

**g)** the ASSIGNOR(S) authorize(s) the CREDITOR(S) to have access to the information kept with the Acquirers, especially those relating to the following data: (i) bank code, (ii) date of the request for maintenance of the domicile, (iii) number of the Point of Sale (PV), (iv) CNPJ of the client, (v) transaction type (credit or debit), (vi) bank BACEN code, branch, and bank account to be held, (vii) Term of maintenance of the domicile; (viii) estimated amounts for payment per brand, (ix) scheduled date for payment, (x) date of the beneficiary (bank, branch and bank in which it is scheduled to occur).

**Sole Paragraph -** The statements and obligations set forth above shall survive for the entire term of this Fiduciary Assignment and shall be automatically applicable in respect of any additional Credit Rights that are delivered to the CREDITOR(S) under the terms of this Fiduciary Assignment.

**Default Causes -** The Parties agree that the occurrence of any of the following events shall be a direct cause for the undue increase in the credit risk assumed by the CREDITOR(S) in the Secured Obligations and in the present Fiduciary Assignment ("Credit Depreciation"), giving rise to the right of CREDITOR(S) automatically and independently of any prior notice, or judicial or extrajudicial written request for performance, (i) to withhold from the Escrow Account(s) the amounts derived from settlement of the Credit Rights until the Credit Depreciation event is remedied, at the satisfactory criteria of the CREDITOR(S); and/or (ii) partially execute this guarantee, pursuant to the "Foreclosure upon the Fiduciary Guarantee" Section of this Fiduciary Assignment, for settlement of the installments

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060.███08- RG 8.222 837-1
Rua Matias Aires, 402- 5º andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just.trd.br- www.just.trd.br

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.                    Página 5 de 55



Translation No. I-54727
Book No. 657
Page 167

due and coming due of the Secured Obligations, when their respective maturities; and/or (iii) early expiration of the Secured Obligations and execute this guarantee, pursuant to the Section "Foreclosure upon the Fiduciary Guarantee" of this Fiduciary Assignment:

**a)** failure by the DEBTOR(S) or ASSIGNOR(S) to comply, within the term and in the form due, of any principal or accessory obligation, of a pecuniary or non-pecuniary nature, contracted with CREDITOR(S) as a result of the Secured Obligations, of this Fiduciary Assignment or of any other instrument executed by the DEBTOR(S) or by the ASSIGNOR(S) with the CREDITOR(S) and/or with any other related company, affiliate, controlling and/or controlled company, directly and/or indirectly, by the CREDITOR(S);

**b)** if any statement made by the DEBTOR(S) or the ASSIGNOR(S) in the Secured Obligations or in this Fiduciary Assignment, as the case may be, is incorrect, inaccurate or misleading in any material respect, without prejudice to the losses and damages due by the respective informant;

**c)** if ASSIGNOR(S) have requested and/or adjudicated its bankruptcy are dissolved or has suffered a legitimate protest instrument by which payment is liable, even if in the condition of guarantor(s), or even if they die or are banned, if individuals;

**d)** if ASSIGNOR(s), proposes an extrajudicial reorganization plan to the CREDITOR(S) or to any other creditor or class of creditors, regardless of whether a judicial ratification of said plan has been requested or obtained; or

**e)** if ASSIGNOR(S) enters into court with a request for judicial reorganization, regardless of whether the reorganization process is processed or granted by the competent court.

**<u>Foreclosure on the Fiduciary Guarantee</u> -** The default or delinquency of the DEBTOR(S) or ASSIGNOR(S) in any of the obligations assumed in the Secured Obligations or in the this Fiduciary Assignment, the CREDITOR(S), as fiduciary owner of the Credit Rights shall exercise them, as well as on the product arising from its collection, all the powers granted to it by the legislation in force, in particular those described in paragraph 3 of Art. 66-B of Law No. 4.728/65, including the powers for judicial purposes and for business purposes, and may sell, assign, redeem or transfer the Credit Rights (or amounts/investments resulting from the amounts arising therefrom), in any form, regardless of auction, judicial sale, prior evaluation or any other judicial or extrajudicial measure, being hereby authorized by DEBTOR(S) and ASSIGNOR(S), irrevocably and irreversibly, pursuant to article 684 of the Civil Code, to perform all acts necessary to transfer the product arising from the collection of the Credit Rights, including, but not limited to, the transfer and debit of the amounts existing in the Escrow Account(s), grant discharge and sign any documents or terms, however special, necessary for the performance of the acts herein, all without the need to give any prior notice or notification to DEBTOR(S) or ASSIGNOR(S). This procedure shall not prevent collection thereof by means of execution, pursuant to the provisions of the applicable law, in case there is outstanding negative balance. If there is any remaining credit balance, it will be immediately made available to the ASSIGNOR(S).

**Paragraph One -** In the case provided in the head provision of this section, CREDITOR (S), at its discretion, shall apply the proceeds of the sale of the Credit Rights and the amounts existing in the Escrow Account(s) in the partial or total settlement of the Secured Obligations, DEBTOR(s) responsible for payment of any the remaining balance shall remain responsible, within the term indicated by the CREDITOR(S) to DEBTOR(S).

**Paragraph Two -** If there is a Secured Obligations not yet due at the time of foreclosure upon the guarantee, CREDITOR(S) shall retain the resources remaining from said execution until the final and complete liquidation of the Secured Obligations, and may, at its discretion, use such funds for securities and/or investments, which, together with their income, shall include the guarantee of a Fiduciary Assignment.

**Paragraph Three** - ASSIGNOR(S), irrevocably and irreversibly, in the form of the applicable law, authorize CREDITOR(S) to apply, in the partial amortization or total settlement of the Secured Obligations, any amounts credited to the Secured Obligation(s), or, if the balance presented in such

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português – Inglês - Matrícula na JUCESP nº 1688- CPF 082.060.██████08- RG 8.222 837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just trd br- www.just.trd.br

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The
verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.                        Página 6 de 55

**Translation No. I-54727**
**Book No. 657**
**Page 168**



Sandra Regina Mattos Rudzit

TRADUTORA PÚBLICA

account(s) is not sufficient to settle the obligations, ASSIGNOR(S) and DEBTOR(S) authorize on an irrevocable and irreversible nature the use of any amounts credited to the Escrow Account(s) held by CREDITOR(S) and/or any other related, affiliated, controlled company and/or controlling company, directly and/or indirectly, by CREDITOR(S).

**Paragraph Four** - For the purposes of this section, ASSIGNOR(S) grant to CREDITOR(S) on an irrevocable and irreversible basis, all powers to (i) request registrations or notations from competent notary public offices and registries, as well as any and all public or private bodies or entities that may be necessary, (ii) sign, on behalf of these, any and all documents and (iii) practice any and any act or business necessary to fulfill the above powers.

**Paragraph Five** - In the event that this Fiduciary Assignment contains more than one DEBTOR, the CREDITOR(S) may exercise its credit rights in the event of the provisions in the item "Default Causes" in relation to all DEBTORS and their Secured Obligations.

<u>**General Provisions**</u> - The Parties agree on the following general provisions:

**Paragraph One** – The parties agree that any amendment to this Fiduciary Assignment may only be made by a written instrument signed by the Contracting Parties;

**Paragraph Two** - ASSIGNOR(S) hereby authorizes, irrevocably and irreversibly, CREDITOR(S) to make the appropriate transactions in their respective Checking Account(s), as informed in the preamble hereof, when the balance(s) is sufficient, for the payment of any and all expenses incurred by the CREDITOR(s) in the preparation, registration of this Fiduciary Assignment, registration of its respective exhibits and any amendments, including, but not limited to, the charges related to other acts and documents that may be required before the notary public office and agencies not competent to exercise any right arising of the guarantee hereby created.

**Paragraph Three -** All notices, requests, demands or other communications shall be made in writing and delivered in person or by electronic mail or by registered mail to the addresses indicated in the preamble or any other address previously designated in writing.

**Paragraph Four -** This Fiduciary Assignment is irrevocably and irrevocably executed, obliging the Parties, as well as their heirs and successors in any capacity, to refrain from exercising any right or option granted by this Fiduciary Assignment, Secured Obligations or by the law to the CREDITOR(S), as well as forbearance for any delays in the performance of any of the obligations assumed by the DEBTOR(S) or by ASSIGNOR(S) in this Fiduciary Assignment or in the Secured Obligations shall not mean novation or derogation from any provision of this Fiduciary Assignment.

<u>**Jurisdiction**</u> - By renouncing the others, however privileged they may be, the Parties elect the Jurisdiction of the Capital of the State of São Paulo to resolve any issues arising from this Fiduciary Assignment, with CREDITOR(S) reserving the right to choose the jurisdiction of the Credit Rights or the domicile of ASSIGNOR(S).

This instrument is issued in three (3) counterparts of equal content and signed by the parties qualified in the preamble, in the presence of the witnesses below.

São Paulo, <u>AUGUST 6, 2019</u>.

| (sgd) | (sgd) |
|---|---|
| (illegible) Milani | Mario Eugenio Mori |
| Relationship Manager | 007958713 |

*Itaú Unibanco S.A.*

CREDITOR

(sgd)

**RAKUTEN BRASIL FINANCIAL SERVI**

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060███08- RG 8.222 837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just trd br- www.just.trd.br

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.

**Translation No. I-54727**
**Book No. 657**
**Page 169**



Sandra Regina Mattos Rudzit

TRADUTORA PÚBLICA

DEBTOR/ASSIGNOR

Witnesses:

| 1. (sgd) | 2. (sgd) |
|---|---|
| Aluisio Ladeira de C. L. Filho | |
| Func - 004509559 | |
| Identity Card (RG): | Identity Card (RG): 378563234 |
| Individual Tax ID (CPF): 069.172.576-48 | Individual Tax ID (CPF): 39304151864 |

Stamp: "Itaú – ACCOMMODATION – SÃO PAULO"?

## EXHIBIT I TO THE

## PRIVATE AGREEMENT OF FIDUCIARY ASSIGNMENT OF CREDIT RIGHTS No.

## No. 0041049965

### - Credit and Debit Card Receivables –

## AUTHORIZATION FOR CHANGE AND MAINTENANCE OF BANKING DOMICILE

| **1. Client Data** | | | |
|---|---|---|---|
| 1.1. Company name | | 1.2. CNPJ No. | |
| RAKUTEN BRASIL FINANCIAL SERVI | | 22.366.799/0001-77 | |
| **2. Data of this authorization** | | | |
| 2.1. Business Establishments: | 2.2. Banking domicile to be maintained | | |
| (CNPJ No.) | Branch | Account | Brand |
| 22.366.799/0001-77 | ▇ | 15▇ | Visa / Hiper |

2.3. Brands:

Mastercard: Mastercard, Mastercard Maestro, Redeshop, Dinners and other brands processed by the Acquirers that are informed by them to **Itaú Unibanco**;

Visa: Visa, Visaelectron and other brands processed by the Acquirers that are informed by them to **Itaú Unibanco**;

Hiper and other brands processed by the Acquirers that are informed by them to **Itaú Unibanco**

2.4. Maturity Date of the maintenance of domicile

UNTIL FINAL AND FULL SETTLEMENT OF THE SECURED TRANSACTION

2.5. Date and place of issue

August 6,2019 – SÃO PAULO, SP

**3.** The **Client** identified in item 1 authorizes **Itaú Unibanco S.A.**, with its principal place of business at Praça Alfredo Egydio de Souza Aranha, No. 100 - Torre Olavo Setúbal, São Paulo, SP, CNPJ No. 60.701.190/0001-04, referred to as "**Itaú Unibanco**", to:

(i) notify, by means of this instrument and pursuant to the provisions of article 290 of the Brazilian Civil Code, the Acquirers that, as guarantee of the credit transaction, the Client has made the fiduciary assignment to **Itaú Unibanco** of its present and future credit rights resulting from all transactions with credit and debit cards of the CNPJs and Brands set forth in sub-items 2.1 and 2.2;

(ii) change the banking domicile indicated as currently in effect to the new banking domicile indicated in sub-item 2.2, held by the Client with **Itaú Unibanco**;

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060▇▇▇08- RG 8.222 837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just trd br- www.just.trd.br

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.                    Página 8 de 55

Translation No. I-54727
Book No. 657
Page 170



Sandra Regina Mattos Rudzit

TRADUTORA PÚBLICA

(iii) request the CIP to keep the banking domicile indicated in sub-item 2.2, from the date hereof to the date of sub-item 2.4, in relation to the types of credit and debit transactions, relating to the Brands informed in sub-item 2.2. In case this banking domicile is linked to the Client's centralizing chain (centralization of the flow of credit rights of more than one legal entity of the same corporate and/or economic group as the Client in a single Banking Domicile), the Client authorizes **Itaú Unibanco** to adopt all measures required with the CIP to maintain all other banking domiciles of the Client that are related or subject to the same centralizing chain, even if these banking domiciles have not been expressly indicated by the Client in this authorization or, in case it is not possible to maintain all other banking domiciles, pursuant to the provisions of this item, to request the Acquirers to separate the centralizing chain, so that it is possible to maintain the banking domicile indicated in this authorization;

(iv) adopt all measures required with the Acquirers for maintenance of all banking domiciles of the Client that have the same branch and checking account (sub-item 2.2) and the same CNPJ (sub-item 2.1.2) in the systems of the Acquirers;

(v) request maintenance of the banking domicile that is the subject matter of this authorization to the Interbank Payment Chamber Payments - CIP, the entity responsible for centralizing the registration, processing and transmission of information relating to the maintenance of banking domicile (destinated Centralizing Entity);

**4.** If the credit transaction(s) executed by the **Client** with **Itaú Unibanco** may be renewed or if the maturity date thereof is more than thirty-six (36) months after execution thereof, the **Client** authorizes **Itaú Unibanco** to request the **Acquirers** to renew the maintenance of banking domicile as many times as necessary, until final and full settlement of said credit transactions(s), irrespective of the formalization of a new banking domicile maintenance authorization.

**5.** In the event of termination of the **Acquirer Agreement,** the **Client** authorizes the **Acquirers** to continue depositing the credits set forth in item 2 in our banking domicile indicated in sub-item 2.2 by the date indicated in sub-item 2.4.

**6.** The **Client** and **Itaú Unibanco** acknowledge that:

**6.1.** the signature of this authorization is a condition for the **Acquirers** to simultaneously comply with the **Acquirer Agreement** and the Banking Domicile Maintenance Agreement executed between them and **Itaú Unibanco;** and

**6.2.** the **Acquirers** may request compliance with the obligations set forth herein pursuant to the provisions of articles 436 and 437 of the Civil Code.

**7.** The **Client** represents to be aware that:

(i) the maintenance of banking domicile set forth in this authorization shall be binding upon all transactions relating to the Brands indicated in sub-item 2.2, irrespective of the **Acquirer** responsible for the capture, processing and settlement of said transactions;

(ii) by the date of sub-item 2.4, the **Acquirers** shall not carry out transactions aiming at advancing the credits of point of sale the banking domicile is subject to maintenance, pursuant to the provisions hereof, except with the prior and express authorization of **Itaú Unibanco;**

(iii) the credit and debit transactions of any of the Brands set forth in sub-item 2.2 may be captured by the same Acquirer, by means of the same Equipment;

(iv) the maintenance of banking domicile set forth in this authorization shall be processed by **Itaú Unibanco,** by the Acquirers and by the **Centralizing Entity** in accordance with the provisions of the Agreement for the Regulation and Protection of Guarantees of Receivables - "Guarantee Control System", the terms and conditions of which the **Client** represents to know.

**7.1.** For purposes of this authorization, the following definitions apply: (a) **Acquirer:** any and all legal entities that accredit individuals or legal entities for the acceptance of credit or debit cards as electronic means of payment in the acquisition of goods and/or services and which provides a technological solution and/or means of connection to the systems of the accredited parties for purposes of capturing

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.

**Translation No. I-54727**
**Book No. 657**
**Page 171**



Sandra Regina Mattos Rudzit

TRADUTORA PÚBLICA

and settling the transactions carried out by means of credit or debit cards; and (b) **Equipment:** electronic terminals or any other equipment, devices, information technology systems, computer programs (including, but not limited to, the POS terminal), used by the **Client,** to enable credit and/or debit transactions.

**8.** Once this authorization is signed, Itaú Unibanco may request the CIP, as from the date hereof, to maintain the banking domicile indicated in sub-item 2.2, being liable to the **Client** for sending the information relating to such banking domicile maintenance.

**9.** The request for maintenance of banking domicile may be immediately processed by the **CIP**.

**10.** The maintenance of banking domicile may only be cancelled before the date set forth in sub-item 2.4 upon notice from **Itaú Unibanco** to the **Acquirers**. As from the business day following cancellation of the maintenance of banking domicile pursuant to the authorization of **Itaú Unibanco**, or as from the maturity date indicated in sub-item 2.4, the **Client** may request the **Acquirers** to change the banking domicile indicated in sub-item 2.2.

(sgd)

**Client:** RAKUTEN BRASIL FINANCIAL SERVI

Data of the **Client's** Representatives**:**

Name:

Individual Tax ID (CPF):

Identity Card (RG):

Title:

Name:

Individual Tax ID (CPF):

Identity Card (RG):

Title:

Stamp: "Itaú – Accommodation – SÃO PAULO"

**EXHIBIT II TO THE**

**PRIVATE AGREEMENT OF FIDUCIARY ASSIGNMENT OF CREDIT RIGHTS (CREDIT AND DEBIT CARD RECEIVABLES) NO. 0041049965**

**DESCRIPTION OF THE SECURED OBLIGATIONS**

For the purposes of the applicable legislation, the following obligations, which comprise the concept of Secured Obligations:

Instrument Name: BANK CREDIT CERTIFICATE No. 730700346242

Creditor: ITAÚ UNIBANCO S.A.

National Corporate Taxpayers' Register (CNPJ/MF): 60.701.190/0001-04

Debtor: RAKUTEN BRASIL FINANCIAL SERVI

National Corporate Taxpayers' Register (CNPJ/MF): 22.366.799/0001-77

Principal Amount: Sixty-five million *Reais* (R$65,000,000.00)

Interest: nine hundredths percent per month (0.19% p.m.), and other charges indicated in the Instrument.

Date of Issue/Instrument Execution: 08/06/2019 and any amendments thereto

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060.███08- RG 8.222 837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just trd br- www.just.trd.br



Translation No. I-54727
Book No. 657
Page 172

Maturity Date: 08/26/2019. The Fiduciary Assignment shall cover any extensions under the instrument.

| (sgd) | (sgd) |
|---|---|
| Thaís Milani | Mario Eugenio Mori |
| Relationship Manager | 007958713 |
| 006160006 | |

| *Itaú Unibanco S.A.* |
|---|
| **CREDITOR** |

(sgd)

### RAKUTEN BRASIL FINANCIAL SERVI
### DEBTOR/ASSIGNOR

Witnesses:

| 1. (sgd) | 2. (sgd) |
|---|---|
| Aluisio Ladeira de C. L. Filho | |
| Func - 004509559 | |
| Identity Card (RG): | Identity Card (RG): 378568294 |
| Individual Tax ID (CPF): 069.172.576-48 | Individual Tax ID (CPF): 39304151864 |

Stamp: "Itaú – ACCOMMODATION – SÃO PAULO"

| FORMALIZATION– ITAU | |
|---|---|
| DONE | CHECKED |
| (sgd) | |

### EXHIBIT III TO THE

### PRIVATE AGREEMENT OF FIDUCIARY ASSIGNMENT OF CREDIT RIGHTS (CREDIT AND DEBIT CARD RECEIVABLES) – FORM No.

The DEBTOR(S) and the ASSIGNOR(S) represent to be aware of and agree that:

A) Specifically in case the Secured Obligations described in Exhibit II involve transactions in foreign currency or agreed with branches of **Itaú Unibanco S.A.** abroad, in addition to the sections set forth in the Fiduciary Assignment, the following sections shall also apply:

**i)** For purposes of compliance with the Minimum Percentage of Guarantee, as defined in the Fiduciary Assignment, the amount of the Secured Obligations shall be converted from the foreign currency into Brazilian currency at the Conversion Rate (defined below) applicable on each calculation date, which will occur in the Frequency of Ascertainment informed in the Fiduciary Assignment.

**ii)** "Conversion Rate" shall be understood as the average foreign-exchange rates for sale of the foreign currency in which the Secured Obligations are denominated, charged in the foreign-exchange market on the business day immediately preceding the Frequency of Ascertainment, which average is disclosed by the Central Bank of Brazil by means of its "website" on the Internet.

**iii)** If, for any reason, the Conversion Rate ceases to exist or to be disclosed, the conversion shall be made by means of use of the rate or parameter applicable to financial transactions of the same nature as the Secured Obligations, which allows verification of the exact equivalence, at any time, of the sum of the amount of the Credit Rights in relation to the Minimum Percentage of Guarantee, as applicable. This rate or parameter will be informed by the Collateral Agent (defined below) to the ASSIGNOR(S)

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060.    08- RG 8.222 837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just trd br- www.just.trd.br

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.



Sandra Regina Mattos Rudzit

TRADUTORA PÚBLICA

and will be binding upon them.

**iv)** In the event of non-payment, or failure to comply with the Fiduciary Assignment or the Secured Obligations, the CREDITOR(S)**,** acting directly or through the Collateral Agent (defined below), is(are) hereby irrevocably, irreversibly and as a condition of the Fiduciary Assignment, authorized to purchase foreign currency with the proceeds of the sale, assignment or other type of settlement of the Credit Rights and make all remittances of such currency abroad, enter into any necessary exchange contract with financial institutions in Brazil that may be indispensable to the realization of such remittances, ASSIGNOR(S), before the Central Bank of Brazil and any other Brazilian governmental authority or financial institution when necessary to the execution of this Fiduciary Assignment, aimed at payment of the Secured Obligations.

**v)** Specifically for the transactions contracted with the branches of **Itaú Unibanco S.A.** located abroad, the branch and/or office in **<COMPLETE>** of **Itaú Unibanco S.A.** (the "Branch Abroad"), hereby appoints **Itaú Unibanco S.A.** (the "Collateral Agent") as its agent to carry out any act and to promote the collection of any amounts arising exclusively from this Fiduciary Assignment and the Secured Obligations in which they act as a creditor, being able to contract and dismiss attorneys, for judicial purposes, to summon, notify, issued a written request for performance, to compromise, abandon, receive and give discharge, to represent its Branch Abroad in and out of court and at any stage or level of jurisdiction, with powers to perform any act and sign any document or instrument necessary for the fulfillment of its duties as Collateral Agent, as well as to receive notices and communications regarding the Fiduciary Assignment.

B) Specifically in the event of existence of transactions of Pre-Shipment Foreign Exchange Advance (ACC) and Post-Shipment Foreign Exchange Advance (ACE) among the Secured Obligations described in <u>Exhibit II</u>, in addition to the sections set forth in the Fiduciary Assignment, the following section shall also apply:

If the Secured Obligations described in <u>Exhibit II</u> contains obligations resulting from export foreign-exchange contracts (each contract, as amended, substituted or supplemented by an instrument of cancellation or write-off, shall be hereinafter referred to as "Foreign-Exchange Contract"), under which the DEBTOR(S) has(have) received or will receive advance of funds, wholly or in part, on account of the price, in Brazilian currency, of the foreign currency bought by the CREDITOR(S) for future delivery (each of them an "Advance Payment" and, collectively, "Advance Payments", it being understood that the amount in foreign currency of each Advance Payment shall be hereinafter referred to as "Amount of the Advance Payment in foreign currency"), the following provisions shall apply:

(i) the ASSIGNOR(S) and the DEBTOR(S) represent to know the law and regulation on Foreign-Exchange Contracts;

(ii) the Interest set forth in the on the respective Foreign-Exchange Contract (the "Interest") shall be levied on the Amount of the Advance Payment in foreign currency, which Interest shall be paid by its countervalue in Brazilian currency calculated in accordance with the Conversion Rate (defined in item A (ii) above);

(iii) in the event of cancellation of any Foreign-Exchange Contract, the DEBTOR(S) shall pay to the CREDITOR(S) the countervalue in Brazilian currency of the Amount of the Advance Payment in foreign currency plus the interest, and calculated in accordance with the foreign-exchange rate to be agreed between the DEBTOR(S) and the CREDITOR(S);

(iv) in the case of write-off of any Foreign-Exchange Contract, the DEBTOR(S) shall pay to the CREDITOR(S) the countervalue in Brazilian currency of the Amount of the Advance Payment in foreign currency plus the interest, calculated in accordance with the highest between the following rates: (i) the foreign-exchange rate set forth in the Foreign-Exchange Contract and (ii) the Conversion Rate;

(v) in the event of write-off or cancellation of any Foreign-Exchange Contract, the DEBTOR(S) shall pay the financial charges determined by the Central Bank of Brazil and the taxes set forth in the applicable law and regulations;

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060.▓▓▓08- RG 8.222 837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just.trd br- www.just.trd.br

**Translation No. I-54727**
**Book No. 657**
**Page 174**

Sandra Regina Mattos Rudzit 

TRADUTORA PÚBLICA

(vi) the Secured Obligations include, without limitation, the financial charges set forth in the applicable law and regulations due as a result of the cancellation or write-off of any Foreign-Exchange Contract and also positive foreign-exchange variation, interest, charges, expenses, default charges, fees and taxes levied upon, resulting or relating to the Foreign-Exchange Contracts and any amendments or extensions; and

(vii) the sections "Default Causes" and "Foreclosure on the Fiduciary Guarantee" of the Fiduciary Assignment also apply in the event of cancellation or write-off of any Foreign-Exchange Contract or, furthermore, on the date on which the return of the Advance Payment granted under any Foreign-Exchange Contract is required.

All capitalized terms and expressions used and not defined herein shall have the same meaning attributed to them in the Fiduciary Assignment. All defined terms and expressions may be used both in the masculine and in the feminine gender and both in the singular and in the plural form. This <u>Exhibit III</u> shall be an integral part of said Fiduciary Assignment whenever the Secured Obligations include any of the transactions mentioned herein.

This <u>Exhibit III</u> is issued in the same number of counterparts as the Fiduciary Assignment, which shall have the same contents and shall be signed by the parties, in the presence of the two witnesses below:

<Place>, <date>.

| (sgd) | (sgd) |
|---|---|
| Thaís Milani | Mario Eugenio Mori |
| Relationship Manager | 007958713 |
| 006160006 | |
| *Itaú Unibanco S.A. - CREDITOR* | |
| (sgd) | (sgd) |
| Jucelia de Aquino Gome(illegible) | Vanilla Gregorio |
| Individual Tax ID (CPF): 227.143.488-23 | Identity Card (RG): 26.892.800-9 |
| Identity Card (RG): 34.217.137-9 | Individual Tax ID (CPF): 248.604.728-02 |
| **(inform the vehicle of Itaú Unibanco abroad) - CREDITOR** | |

(sgd)

**[ASSIGNOR] - ASSIGNOR**

(sgd)

**- DEBTOR**

Witnesses:

| 1. (sgd) | 2. (sgd) |
|---|---|
| Aluisio Ladeira de C. L. Filho | |
| Func - 004509559 | |
| Identity Card (RG): | Identity Card (RG): 378568294 |
| Individual Tax ID (CPF): 069.172.576-48 | Individual Tax ID (CPF): 39304151864 |

Stamp: "Itaú – ACCOMMODATION – SÃO PAULO"

| FORMALIZATION – ITAU | |
|---|---|
| DONE | CHECKED |

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060█████08- RG 8.222 837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP-  Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just trd br- www.just.trd.br

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.                    Página 13 de 55

Translation No. I-54727
Book No. 657
Page 175



**Sandra Regina Mattos Rudzit**

TRADUTORA PÚBLICA

| (sgd) | |
|---|---|

INSTRUMENT:

AUTHENTICATION (SIM-II): CD3380D4-C083-4B27-B46A-0A75D1E02AE8

ITAU _CESSÃOFIDUCIÁRIA _CTO _DIREITOSCREDITÓRIOS /CARTÃO /SIMPLIFICADA /VERSÃOPES

**Logo of Itaú Unibanco S.A.**

(Handwritten text: "2778242")

**Bank Credit Certificate**

**Credit Extension in Checking Account (Monthly Hot Account – Card Receivables)**

Issuer corporate name

RAKUTEN BRASIL FINANCIAL SERVI

(Handwritten text: "22 556 799/0001-77")

identified in the Proposal of Opening of Checking Account set forth in sub-item 1.9, hereinafter referred to as **Client**.

**1. Data of this Bank Credit Certificate**

| 1.1. Issue Date 08/06/2019 | 1.2. Contractual account | | | | 1.3. Credit Facility R$65,000,000.00 | 1.4.   Maturity   of this Certificate **AT SIGHT** |
|---|---|---|---|---|---|---|
| | Branch ▆ | Account No. ▆ | DAC 2 | Category 478-8 | | |
| 1.5. Credit Facility Maturity 08/26/2019 | | | | 1.6. Credit Facility Extension Commission – 0.00% of the credit facility | | |
| 1.7. Interest Rate valid for this date | | | | | | |
| 1.7.1.  Per month  (30 days) 0.19% | 1.7.2.  Per annum  (360 days) 2.41% | | 1.7.3. Reference Rate 100.00% DI-Over (Extra-group) | | 1.7.4.       Capitalization Periodicity MONTHLY | |
| 1.8. Charge Payment Day 30th | | 1.9. Checking Account | | | 1.10. Escrow Account | |
| | | Branch ▆ | Account No. 0▆ | DAC 7 | Branch 1▆ | Account No. DAC 8 |
| 1.11. Guarantee Code (for Itaú internal use) 418 | | 1.12. Issue Place SÃO PAULO, SP | | | | |
| 1.13. Payment Place SÃO PAULO, SP | | | | | | |

On the date of presentation, which may be made within 20 years, the **Client** shall pay for this Bank Credit Certificate ("Certificate") to **Itaú Unibanco S.A.**, with its principal place of business at Praça Alfredo Egydio de Souza Aranha, 100 - Olavo Setúbal Tower, in the City of São Paulo, State of São Paulo, enrolled with the National Corporate Taxpayers Register (CNPJ) under No. 60.701.190/0001-04, hereinafter referred to as **Itaú**, the legal, clear and enforceable debt at sight corresponding to the

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688 - CPF 082.060.▆▆▆08 - RG 8.222 837-1
Rua Matias Aires, 402 - 5° andar, cj. 51 - 01309-020 - São Paulo - SP - Brasil - Fone/Fax: 55-11-3155-7383 - e-mail: just@just.trd.br - www.just.trd.br

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.                    Página 14 de 55

Translation No. I-54727
Book No. 657
Page 176



Sandra Regina Mattos Rudzit

TRADUTORA PÚBLICA

total used amount of the credit facility extended as set forth in sub-item 1.3 ("Credit Facility"), plus any charges set forth in this Certificate.

On the date indicated in sub-item 1.8 and on the maturity of the credit facility set forth in sub-item 1.5, the **Client** shall pay to **Itaú** the charges and used amounts of the credit facility as provided for in this Certificate.

**2. Purpose** - **Itaú** shall extend the revolving facility to the **Client** which is made available in the Checking Account indicated in sub-item 1.9 ("Checking Account"), as long as the guarantee(s) set forth in the item "Guarantees" of this Certificate is/are established.

**3. Use of the Facility** – The credit facility shall be used by the **Client** in a single time or in installments, upon requests of transfers of amounts from the Contractual Account indicated in sub-item 1.2 ("Contractual Account") to the Checking Account, which shall be fulfilled by **Itaú** as follows:

3.1. The **Client** shall request the transfers at the branches or by means of the convenience services of **Itaú,** if contracted by the **Client.**

3.2. The existence of outstanding balance in the Checking Account shall be characterized as a request of use of the credit facility in the amount of said balance, which **Itaú** shall fulfill, with due regard for the credit facility amount available, by transferring the corresponding amount from the Contractual Account to the Checking Account.

3.3. Such transfer made by **Itaú** shall be characterized as use of the credit facility by the **Client,** and the outstanding balance of the Contractual Account shall correspond, at each time, to the total amounts used.

3.4. The credit facility amount may be increased at any time, at the discretion of **Itaú,** which is hereby authorized by the **Client** and by the **Joint Debtors.**

3.4.1. The **Client** undertakes to notify said increase in the credit facility to the **Joint Debtors.**

**3.4.2. In the event that the Client or the Joint Debtors do not agree with any such increase in credit facility, they shall notify Itaú of their disagreement within 5 days as from the date of increase in the credit facility, in order to have the previous credit facility amount restored. The use of the credit facility after such term shall be deemed as the consent of the Client and the Joint Debtors with the new amount of credit facility.**

**3.5. The use of the credit facility shall be conditioned at all times to the establishment and maintenance of the guarantees as set forth in the item "Guarantees" of this Certificate, and Itaú shall solely fulfill those requests of use of the credit facility that are covered by the contracted guarantees.**

**3.6. The statements of the Checking, Contractual and Blocked Accounts and the calculation spreadsheets are integral parts of this Certificate and the amounts set forth therein, ascertained in accordance with this Certificate, are legal, clear and defined amounts. In the event that the Client does not agree with any amounts of any statement or spreadsheet, the Client shall notify Itaú in writing, and in case of the Client's failure to do so within 5 days as from expiration of the term of effectiveness of this Certificate, said documents shall be documental evidence of the use, legality and liquidity of the credit.**

3.7. At the discretion of **Itaú,** the credit facility may be reduced at any time during the maturity term set forth in sub-item 1.5., in the following events:

(i) if the **Client** is included in any record of the credit protection bodies;

(ii) if the **Client** delays the payment of any obligations to any other financial institutions or their suppliers;

(iii) any increase in the **Client's** indebtedness in an amount incompatible with the **Client's** sales revenue;

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060.███-08- RG 8.222 837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP-  Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just.trd.br- www.just.trd.br

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.

Translation No. I-54727
Book No. 657
Page 177

Sandra Regina Mattos Rudzit

TRADUTORA PÚBLICA

(iv) if any legal proceeding is filed against the **Client** that may result in impossibility of compliance with the **Client's** obligations or of maintenance of the **Client's** operation or activity.

3.8. **Itaú** shall provide the **Client** with a calculation spreadsheet on a monthly basis, demonstrating, for each concerned period:

a) the credit facility;

b) the daily outstanding balance;

c) the period of calculation of the charges;

d) the debt date of the charges;

e) the total amount of the charges collected in the period, corresponding to the sum of the charges calculated on a daily basis in accordance with the rate in effect on such date;

f) the credit facility opening commission and the maturity date of the credit facility;

g) the IOF (Tax on Financial Transactions) tax rate and the total amount of said tax, calculated pursuant to the law;

h) the contracting and collection tariffs.

3.9. **Itaú** shall provide the **Client** with the following information at **Itaú Empresas na Internet** *(internet banking)* for each day of the period:

a) the daily use of the contractual credit facility;

b) the interest rate for 30 days;

c) the DI-Over (Extra-Group) reference rate;

d) the percentage on the reference rate;

e) the interest rate in effect on each day;

f) the effective monthly interest rate;

g) the effective annual interest rate; and

h) the amount of the daily charges calculated.

**4. Charges the Payment** – The **Client** shall pay to **Itaú** the charges indicated in this item and, on the maturity date of the credit facility, the total amounts used.

4.1. On a monthly basis, on the day indicated in sub-item 8, and on the maturity date of the credit facility, the capitalized interest accrued in the period, calculated on a daily basis on the used amount of the credit facility, by applying the rate obtained by the following formula:

$$\text{Rate} = \left[ \frac{i_{am}}{100 \times D.U.} \right] + \left[ \left( \frac{CDI_{am}}{3000} \right) \times \left( \frac{P}{100} \right) \right]$$

where:

$i_{am}$ = interest rate for 30 days (sub-item 1.7.1)

$CDI_{am}$ = DI-Over (Extra-Group)

$P$ = percentage of DI-Over (Extra-Group) indicated in sub-item 1.7.3

$D.U.$ = quantity of business days in the month.

4.2. Where: (a) "Period of Calculation of the Charges": the period during which the charges are calculated, whereby the first one begins on the date of use of the Credit, as long as the credit facility is active; (b) "DI - Interbank Deposit": time investment of amounts made by a financial institution with

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060.███08- RG 8.222 837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP-  Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just trd br- www.just.trd.br

Translation No. I-54727
Book No. 657
Page 178



Sandra Regina Mattos Rudzit

TRADUTORA PÚBLICA

another one, whether pre- or post-fixed; (c) "DI-Over-Cetip": the average rate of the pre-fixed DI agreement between financial institutions that do not form part of the same corporate group, for one day, ascertained by CETIP (Notes Financial Custody and Settlement House) and published by the press.

4.3. On the date hereof and on the dates of renewal of the credit facility, the **Client** shall pay the credit facility opening commission at the rate set forth in sub-item 1.6, calculated on the credit facility amount indicated in sub-item 1.3. In case of acceleration of this Certificate, **Itaú** shall refund the commission to the **Client,** in proportion to the period elapsed from the date of acceleration to the agreed maturity date.

4.4. **Itaú may pass on to the Client the amount of any taxes and charges that may be created or increased and which may be payable in connection with this Certificate, upon prior information to the Client.**

4.5. The **Client** shall pay the tax on financial transactions (IOF) pursuant to the applicable law.

4.6. The **Client** acknowledges that the reference rate indicated in sub-item 1.7.3 is legal, publicly disclosed and regularly and impartially calculated. In the event of discontinuation, limitation, non-disclosure, legal or judicial prohibition of use of the DI-OVER (Extragroup) Rate, the SELIC (Custody and Settlement Integrated System) Rate, set by the Monetary Policy Council – COPOM and disclosed by the Central Bank of Brazil – BACEN, shall be used instead.

**5. Payment Method** – The **Client** shall pay to **Itaú**:

a) interest and other charges by means of debit made by **Itaú** from the Checking Account; and;

b) on the maturity date of the credit facility, the amounts used, by means of transfer to be made by **Itaú** from the Checking Account to the Contractual Account.

5.1. The **Client** hereby authorizes **Itaú** to make the debits above in the Checking Account, which shall have sufficient balance available. Insufficient balance available in the Checking Account shall be characterized as delayed payment and authorizes **Itaú,** at its discretion, to make the transfer or debit by generating advances to depositor, as provided for in the Checking Account Opening Agreement.

**6. Joint Debtors** – The persons identified below, hereinafter referred to as **Joint Debtors,** declare to be jointly liable for the obligations of the **Client** in this Certificate.

**7. Guarantees** – In order to guarantee the payment of any amount associated with this Certificate, the following guarantees are created:

7.1. Fiduciary assignment of your current and future credits with the **Acquirers** or **Payment Facilitators**, resulting from transactions involving the purchase of products and services offered in your points of sale and paid with the use of the credit or debit cards of the Brands indicated in the Instrument of Authorization for Maintenance of Banking Domicile, attached to this Certificate ("**Receivables**").

7.1.1. The following definitions apply: (a) "**Brands**": brands processed by the **Acquirers** or **Payment Facilitators** as informed in the Instrument of Authorization for Maintenance of Banking Domicile; and (b) "**Acquirers** or **Payment Facilitators**": any legal entity that accredits persons for the acceptance of credit and/or debit cards of the brands as means of payment in the acquisition of assets and/or services and which provides technological solution and/or means of connection to the systems of the accredited persons for the capture and settlement of transactions carried out with said cards.

7.1.2. The **Client** agrees to immediately request to the bank that holds the banking domicile of the **Receivables**, in the event of change in said domicile, the due release before the entity responsible for registration of the banking domiciles for payment of the **Receivables** of the maintenance of banking domicile created in favor of that bank, which release shall be completed within 30 days as from the date of this Certificate.

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060.███-08- RG 8.222 837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just trd br- www.just.trd.br

**Translation No. I-54727**
**Book No. 657**
**Page 179**



Sandra Regina Mattos Rudzit

TRADUTORA PÚBLICA

7.1.3. The **Client** shall keep the banking domicile unchanged until the settlement of all obligations under this Certificate and may not request its change to any of the **Acquirers** or **Payment Facilitators**, or to the entity in charge of the registration of the banking domiciles for payment of the Receivables without the express consent of Itaú.

7.1.4. Itaú's consent to the change in the banking domicile shall produce effects within 5 business days as from the date of acceptance by Itaú.

7.1.5. In case any of the **Acquirers** or **Payment Facilitators** advances the payment of the **Receivables,** such advance shall be made exclusively by means of credit to the Escrow Account.

7.1.6. **During effectiveness of this Certificate, the Client may neither offer the Receivables as guarantee of other credit transactions, except for transactions entered into with Itaú, nor refuse, limit or restrict the use of the cards mentioned in sub-item 7.1 for payment for the products and services it supplies.**

7.1.7. Until full settlement of the outstanding balance resulting from this Certificate, the amount of the **Receivables** still unpaid (schedules), as informed by the **Acquirers** or **Payment Facilitators**, added to the balance of the Escrow Account, shall total an amount equal to the Minimum Amount of Guarantee, which shall correspond to the amount equivalent to the total outstanding balance under this Certificate.

7.1.7.1. **Itaú** shall only release to the **Client** the amounts credited to the Escrow Account, crediting them to the Checking Account, if: (i) **Client** is compliant with all obligations under this Certificate; (ii) the amount of the **Receivables** still unpaid (schedules) is sufficient to achieve the Minimum Amount of Guarantee, after said release; and (iii) there is no outstanding balance in the Contractual Account.

7.1.7.2. In case the events described above do not occur, **Itaú** is authorized to maintain the amounts originating from payment of the **Receivables** in the Escrow Account in a sufficient amount for these amounts, added to the amount of the **Receivables** still unpaid (schedules), to correspond to the Minimum Amount of Guarantee.

7.1.7.3. The amounts credited to the Escrow Account that, after the withholding set forth above, exceed the Minimum Amount of Guarantee shall be released by **Itaú** to the **Client.**

7.1.7.4. If, for any reason, any of the **Acquirers** or **Payment Facilitators** does not send the information on the amount of the **Receivables** still unpaid (schedule) to be transferred by it to the Client in a given period, the Minimum Amount of Guarantee shall be calculated considering only the information with respect to the amount of Receivables still unpaid (schedule) actually sent by the other **Acquirers** or **Payment Facilitators.**

7.1.7.5. **In case the Client does not have balance in the Escrow Account corresponding to the amount equal to the Minimum Amount of Guarantee on the date of execution of this Certificate, the Client shall supplement this amount until it reaches the Minimum Amount of Guarantee.**

7.1.8. The amounts relating to the settlement or advance payment of the **Receivables** credited to the Escrow Account shall be transferred by Itaú to the Checking Account and from the latter to the Contractual Account, for the amortization or settlement of the outstanding balance of such contractual account.

7.1.8.1. **Itaú** may maintain the Escrow Account balance invested; in this case, the rights on the investment and the yields obtained from the investment shall become part of the guarantee.

7.2. Other additional guarantees, if required by Itaú, provided by means of documents enclosed hereto, which form an integral part of this Certificate.

7.3. Itaú ensures the Client free operation of the funds originating from advances of receivables carried

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060.███-08- RG 8.222 837-1
Rua Maués Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just trd br- www.just.trd.br

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.                    Página 18 de 55

Translation No. I-54727
Book No. 657
Page 180



**Sandra Regina Mattos Rudzit**

TRADUTORA PÚBLICA

out with acquirer and payment facilitator institutions, up to the daily limit corresponding to the excess amount of the schedule of receivables in relation to the Minimum Amount of Guarantee, which may be consulted in the Itaú 30 Horas Portal.

7.3.1. The funds originating from advance transactions that cannot be freely operated may be withheld by **Itaú** for up to **two business days,** or within the longest term authorized by law, after which these funds must be released to the **Client** or used to amortize the outstanding balance of the transaction.

7.4. The client authorizes **Itaú** to inform the acquirer institutions and the payment facilitators: (a) of the agreement on credit transactions secured by payment arrangement receivables, including the necessary data for the financial settlement of these receivables in the domicile institution indicated in the respective agreement, during effectiveness thereof; (b) of the termination of credit transaction agreements secured by payment arrangement receivables within the legal term.

**8. Credit Facility Maturity and Renewal** – The Credit Facility shall be in effect until the date of sub-item 1.5. **Itaú** may renew the credit facility at its discretion. In such event, by the date of sub-item 1.5, **Itaú** shall provide information to the **Client** and to the **Joint Debtors,** at the branch indicated in sub-item 1.9 or at the ATMs, about the following specific conditions of this Certificate, which shall continue to be also governed by the other sections set forth herein:

a) the credit facility amount;

b) the interest rate for the renewal date;

c) the credit facility opening commission amount;

d) the renewal date of the credit facility;

(e) the maturity date.

8.1. **The Joint Debtors agree with the renewal of the credit facility up to the amount indicated in sub-item 1.3 or up to the increased amount of credit facility set forth in sub-item 3.4., and agree that any amounts used after such renewal are subject to the maximum interest rate equivalent to the greatest rate informed by Itaú to the Central Bank of Brazil on the renewal date for transactions of the same nature.**

8.2. At each renewal of the credit facility, the contractual conditions of item 1 shall be modified by the new data that shall be informed by **Itaú** to the **Client.**

8.3. **If the Client or the Joint Debtors choose not to renew the credit facility or do not agree with the conditions informed for renewal thereof, they shall notify Itaú of their disagreement within 5 days as from the maturity date of the credit facility and immediately settle the outstanding balance, calculated in accordance with the previously effective conditions. The use of the credit facility after such term shall be deemed as the consent of the Client and the Joint Debtors with the conditions of renewal of the credit facility.**

**9. Delayed Payment and Fine** – Without prejudice to the possibility of acceleration, in case of delayed payment of any obligation of this Certificate, any amounts due and unpaid shall be accrued by the conventional interest indicated in sub-item 1.7, plus default interest of 1% per month, calculated on a prorata basis and capitalized on a daily basis, from the maturity date of the obligation to the date of actual payment thereof, in addition to a fine of two percent (2%).

9.1. In case of judicial or extrajudicial collection, the defaulting party shall pay collection expenses to the creditor party, including court costs and attorney's fees.

9.2. In case of default of the **Client, Itaú** shall be entitled to carry out the immediate execution of this Certificate and foreclosure of the respective guarantees.

9.3. **Itaú may offset any credits that it may owe to the Client or of the Joint Debtors against any credits that the Client or the Joint Debtors may owe to Itaú.**

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060.███08- RG 8.222 837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just.trd br- www.just.trd.br

Translation No. I-54727
Book No. 657
Page 181



Sandra Regina Mattos Rudzit

TRADUTORA PÚBLICA

9.4. **The Client and the Joint Debtors hereby irrevocably and irreversibly authorize Itaú to debit from any Checking Accounts held by them with Itaú, up to the limit permitted by the funds, all amounts due to Itaú under this Certificate.**

**10. Acceleration** - **Itaú** may consider any obligations arising out of this Certificate accelerated and reduce or terminate the credit facility, upon occurrence of any of the following:

a) default of any obligation arising out of this Certificate or of any instrument entered into by the **Client** with **Itaú** or with any company directly or indirectly controlled by **Itaú Unibanco Holding S.A.;**

b) if the **Client** files for or is adjudicated bankrupt, files for court-supervised or extrajudicial reorganization, is dissolved or suffers the protest of any instrument for whose payment it is liable;

c) death, insolvency, interdiction of any of the **Joint Debtors** or occurrence of any of the events described in item (b) in relation to any of the **Joint Debtors,** without presentation of a substitute acceptable to **Itaú** within 15 days as from occurrence of such event;

d) if the guarantees of this Certificate or of the exhibits hereto are not consummated or formalized or if said guarantees become inappropriate or insufficient to guarantee the obligations of this Certificate and are not replaced within 15 days as from notice from **Itaú;**

e) if a final and non-appealable judgment is rendered due to the performance, by the **Client, Joint Debtors** or managers of the **Client** or of the **Joint Debtors,** of any acts resulting in race or gender discrimination, child labor, slave labor, moral or sexual harassment or crime against the environment;

f) upon occurrence of any process of corporate restructuring or change of direct or indirect control in which the **Client** is involved.

g) change of the business purpose or principal activity of the **Client** or disposal of any commercial establishment or of a material portion of assets or rights of its fixed assets.

h) if the **Client** is sued due to failure to pay a debt.

i) request, by the **Client**, to terminate the Checking Account held with **Itaú**.

j) in the event of supervening rule or regulation that prevents this Certificate from remaining in effect.

10.1. The **Client** undertakes to immediately notify **Itaú** of the occurrence of any of the events described in items (b), (c), (e), (f) or (g), above.

**11. Tariffs** – For processing of this transaction and of any renewals of the credit facility and of the transactions between the accounts referred to in this Certificate, the **Client** shall pay the tariff set forth in the Table of Tariffs affixed on the **Itaú** branches in effect on the date hereof and on the dates of renewal of the credit facility.

**12. Disclosure of Delayed Payment** – If the **Client** fails to make any payment by the maturity date, **Itaú** may notify such fact to SERASA, SPC and anybody in charge of recording delayed payments and default of contractual obligations.

**13. Credit Information System (SCR)** – The **Client** and the **Joint Debtors** authorize, at any time, even after termination of this Agreement, **Itaú,** the companies of Itaú Unibanco Conglomerate and the other authorized institutions to consult the SCR in accordance with the provisions of the regulations and which acquire, receive or pronounce to be interested in acquiring or receiving as guarantee, wholly or in part, credit transactions for which the **Client** and the **Joint Debtors** are liable ("Authorized Institutions"), to consult information about it in the SCR.

13.1. The SCR is composed of information sent to the Central Bank of Brazil (BACEN) on credit transactions, pursuant to the provisions of the regulation. The purpose thereof is to provide BACEN with information to monitor the credit in the financial and inspection system, in addition to enabling

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060.██████08- RG 8.222 837-1
Rua Maria Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just trd br- www.just.trd.br

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The
verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.                    Página 20 de 55

Translation No. I-54727
Book No. 657
Page 182



TRADUTORA PÚBLICA

the exchange of information among financial institutions.

13.1.1. The **Client** and the **Joint Debtors** represent to be aware that the consultations to the SCR shall be made based on this authorization and that the companies of the **Itaú Unibanco** Conglomerate may exchange information on the **Client** and the **Joint Debtors** contained in its record.

13.1.2. The **Client** and the **Joint Debtors** further represent to be aware that the data on the amount of their debts, both coming due and overdue, including overdue debts written off with loss, as well as the amount of the co-obligations they have assumed and of the guarantees they have provided shall be provided to the BACEN and registered with the SCR, which representation shall serve as prior communication of these records.

13.1.3. The **Client** and the **Joint Debtors** may have access, at any time, to their data in the SCR by the means provided by the BACEN, including on its website and, in the event of inconsistency, request the correction or exclusion thereof or the registration of a pronouncement on disagreement, as well as the registration of judicial measures, upon request to the service center of the institution that registered the data with the SCR.

**14. Environmental Liability** – The **Client** and the **Joint Debtors** represent that on the date hereof and during the term of effectiveness of this Certificate: (a) they comply and shall comply with the labor law relating to occupational health or safety, including in relation to slave or child labor; (b) their activities and properties are and shall be in compliance with the Brazilian environmental law, including in relation to the Biosafety Law; and (c) the funds arising out of this Certificate shall be solely allocated to lawful purposes that strict comply with the law referred to herein.

14.1. The **Client** and the **Joint Debtors** shall provide **Itaú,** upon request, with any documents required by the applicable environmental and labor law for the purpose of certifying the regular performance of their activities.

14.2. Regardless of negligence, the **Client** and the **Joint Debtors** shall reimburse **Itaú** for any amount that it may be required to pay, and shall indemnify it for any damages and losses relating to any environmental or occupational health and safety damages which any authority believes to be related to the use of the funds arising out of this Certificate.

**15. Anti-money laundering and Anticorruption** – The **Client** acknowledges and declares that it complies with the law of anti-money laundering and terrorism financing and against acts of corruption and damages to the Brazilian and foreign public administration and shall immediately notify **Itaú** in case that it becomes aware of any act or fact relating to this Certificate that violates any rules, in which case **Itaú** may take any measures that it believes to be required.

**16. Expenses.** The **Client** shall pay all expenses arising out of the registration of this Certificate and the exhibits hereto, by means of debit from the Checking Account, in an amount informed by **Itaú** 5 days in advance.

**17. Total Effective Cost ("CET")** - The **Client** acknowledges the Total Effective Cost ("CET") before entering into this transaction, expressed as an annual percentage rate, indicated in the enclosed spreadsheet. The calculation of the CET considers: (a) the amount of the credit facility; (b) the transaction term, estimated as 30 days; and (c) the conventional interest rate, the amount of the taxes, the bank tariffs and any other expenses provided for in this Certificate. The CET was calculated for the event of full use of the credit facility for the estimated term of 30 days; if that does not take place, the CET shall be smaller.

**18. Declaration of Reading** – The **Client** and the **Joint Debtors** declare that they read this Certificate and do not have any doubt in relation to any of its sections.

**19. Jurisdiction** – The Courts of the Judicial District of the place of issue of this Certificate are hereby elected as the courts of jurisdiction, and the party that brings a suit may choose the Courts of the **Client's** domicile.

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060.███08- RG 8.222 837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP-  Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just.trd.br- www.just.trd.br

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The
verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.                                     Página 21 de 55

Translation No. I-54727
Book No. 657
Page 183

Sandra Regina Mattos Rudzit

TRADUTORA PÚBLICA 

**20. Delivery of Communications – The Client** hereby authorizes the delivery of communications relating to **Itaú** products and services, including by means of e-mails and mobile messages. This authorization may be cancelled at any time upon request to **Itaú** Service Center. For security reasons, **Itaú** may always send messages and information relating to suspected fraud, returned checks, grant of advance to the depositor and denied transactions. For these communications, the mobile number and the e-mail contained in the updated record shall be used.

**21. Assignment –** The **Client** and the **Joint Debtors** represent to be aware that **Itaú** may, at any time, assign this transaction, wholly or in part, to a company directly or indirectly controlled by Itaú Unibanco Holding S.A., as well as to third parties.

Place and date indicated on the first page of this Certificate.

**Client** (identified on the first page of this Certificate)

Signature(s): (sgd)

Name of the Legal Representative(s) (in full):

**Joint Debtors:**

| 1) | 2) |
|---|---|
| Name: | Name: |
| CPF/CNPJ: | CPF/CNPJ: |
| Tel.: | Tel.: |
| Address: | Address: |
| 3) | 4) |
| Name: | Name: |
| CPF/CNPJ: | CPF/CNPJ: |
| Tel.: | Tel.: |
| Address: | Address: |

**Amicable Resolution of Conflicts –** For consultations, information and transaction services, please go to www.itau.com.br or call 0300 100 7575, on business days, from 08:00 a.m. to 08:00 p.m., or talk with your manager. For complaints, cancellations and miscellaneous information, call the Customer Service Center (SAC): 0800 728 0728, available on a 24/7 basis. If you are not satisfied with the solution delivered, contact the Ombudsman's Office: 0800 570 0011, on business days from 09:00 a.m. to 06:00 p.m. Hearing/speaking impaired persons: 0800 722 1722, available on a 24/7 basis.

| 23635-6    (FL)<br>GJNE - 05/19 | 1st   COUNTERPART   (NEGOTIABLE):   ITAÚ   UNIBANCO;   2nd COUNTERPART   (NON-NEGOTIABLE)   CLIENT;   OTHER COUNTERPARTS   (NON-NEGOTIABLE):   OTHER   INTERVENING PARTIES |
|---|---|

Stamp: "Itaú – ACCOMMODATION – SÃO PAULO"

| FORMALIZATION – ITAU | |
|---|---|
| DONE | CHECKED |
| (sgd) | |

Logo of Itaú Unibanco S.A.

### AUTHORIZATION FOR CHANGE IN AND MAINTENANCE OF BANKING

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688 - CPF 082.060██████08 - RG 8.222 837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just trd br- www.just.trd.br



Translation No. I-54727
Book No. 657
Page 184

## DOMICILE

| 1. Client Data | | | |
|---|---|---|---|
| 1.1. Company name | | 1.2. CNPJ No. | |
| RAKUTEN BRASIL FINANCIAL SERVI | | 22.366.799/0001-77 | |
| 2. Data of this authorization | | | |
| 2.1. Banking domicile to be maintained | | | |
| 2.1.1 Bank | 2.1.2 Branch | 2.1.3 Account No. | 2.1.4. Brand |
| 341 | ▉ | 15▉ | Master |
| | | | VISA |

2.2. Brands:

(x) MasterCard, MasterCard Maestro, Redeshop, and other brands processed by the Acquirers and informed by them to Itaú;

(_) Visa, Visa Electron and other brands processed by the **Acquirers** that are informed by them to **Itaú.**

2.3. Term of this authorization

UNTIL FINAL AND FULL SETTLEMENT OF THE SECURED TRANSACTION

2.4. Issue date and place 08/06/2019 - SÃO PAULO, SP

**3.** The **Client** identified in item 1 authorizes **Itaú Unibanco S.A.**, with its principal place of business at Praça Alfredo Egydio de Souza Aranha, No. 100, Olavo Setúbal Tower, São Paulo, State of São Paulo, National Corporate Taxpayers' Registry (CNPJ) No. 60.701.190/0001-04 **("Itaú")** to:

(i) notify the **Centralizing entity,** identified in sub-item 6.1, that the **Client** has formalized a financial transaction with Itaú linked to its present and future credit rights, resulting from all transactions with credit and/or debit cards of the Brands indicated in sub-item 2.2;

(ii) change, whenever the case, the banking domicile currently in effect to the new banking domicile indicated in sub-item 2.1;

(iii) request the **Centralizing entity** to maintain the banking domicile indicated in sub-item 2.1, from the date hereof to the date of sub-item 2.3, in relation to the type(s) of credit and debit transaction(s), relating to the Brands indicated in sub-item 2.2.

(iv) in case this banking domicile is linked to the centralizing chain of the **Client** (centralization of the flow of credit rights of more than one legal entity of the same corporate and/or economic group of the **Client** in a single Banking Domicile), adopt all necessary measures with the **Centralizing entity** for maintenance of all other banking domiciles of the **Client** that are related to the same centralizing chain, even if these banking domiciles have not been expressly indicated in this authorization or, in the event of impossibility to maintain all banking domiciles, request the **Centralizing Entity** to separate the centralizing chain, to enable the maintenance of banking domicile indicated herein;

(v) adopt all measures required before the **Centralizing Entity** for maintenance of all banking domiciles of the **Client** that have the same CNPJs (informed in Exhibit I) in the system of the **Centralizing Entity;**

(vi) have access to its information with the **Acquirers** or the **Centralizing Entity** relating to the debit transactions and/or credit transactions of the Brands indicated in sub-item 2.2; and

(vii) provide the **Acquirers** and the **Centralizing Entity** with all information and documents relating

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060.▉▉▉08- RG 8.222 837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just trd br- www.just.trd.br

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.                    Página 23 de 55

**Translation No. I-54727**
**Book No. 657**
**Page 185**



TRADUTORA PÚBLICA

to the financial transaction that resulted in this authorization;

(viii) if the financial transaction executed by the **Client** may be renewed or if the maturity date thereof falls on a date after the lapse of thirty-six (36) months, request the **Centralizing Entity** to renew the maintenance of banking domicile as many times as necessary, until full settlement of the financial transaction, irrespective of the formalization of a new instrument of authorization;

(ix) whenever the maintenance of banking domicile set forth in this authorization is created in an escrow account linked to the financial transaction agreed with **Itaú,** request the **Centralizing Entity** to change the banking domicile to a checking account of free operation, held by it, to which the escrow account is related;

(x) whenever the maintenance of banking domicile set forth in this authorization is created in a checking account of free operation, request the **Centralizing Entity** to change the banking domicile to an escrow account linked to such checking account, relating to the financial transaction agreed with Itaú.

**4.** In the event of termination of any of the **Acquirer Agreements**, the **Client** authorizes the respective **Acquirer** to continue depositing the credits set forth in item 2 in the banking domicile indicated in sub-item 2.1 by the date indicated in sub-item 2.3.

**5.** The **Client** and **Itaú** acknowledge that: (a) the signature of this authorization is a condition for the **Acquirers** to simultaneously comply with the **Acquirer Agreement** and the Banking Domicile Maintenance Agreement executed between each **Acquirer** and **Itaú;** and (b) the **Acquirers** may request compliance with obligations set forth herein pursuant to the provisions of articles 436 and 437 of the Civil Code.

**6.** The **Client** represents to be aware that:

(i) the maintenance of banking domicile set forth in this authorization shall be binding upon all transactions relating to the Brands indicated in sub-item 2.2, irrespective of the **Acquirer** responsible for the capture, processing and settlement of said transactions;

(ii) the maintenance of banking domicile, whenever made based on the do CNPJ root (first nine digits), shall automatically bind all other CNPJ numbers that contain the same root and which do not have maintenance of previous banking domicile;

(iii) in the event of the preceding item, in case a new CNPJ containing the same root indicated herein is created, this new CNPJ shall also be bound to this authorization;

(iv) by the date of sub-item 2.3, the **Acquirers** shall not carry out transactions aiming at advancing the credits of point of sale the banking domicile is subject to maintenance, pursuant to the provisions hereof, except with the prior and express authorization of **Itaú;**

(v) the credit and debit transactions of any of the Brands set forth in sub-item 2.2 may be captured by the same **Acquirer**, by means of the same Equipment;

(vi) the maintenance of banking domicile set forth in this authorization shall be processed by **Itaú**, by the **Acquirers** and by the **Centralizing Entity** in accordance with the provisions of the Agreement for the Regulation and Protection of Guarantees of Receivables - "Guarantee Control System", the terms and conditions of which the **Client** represents to know.

**6.1.** For purposes of this authorization, the following definitions apply: (a) **Acquirer**: any and all legal entities that accredit individuals or legal entities for the acceptance of credit or debit cards as electronic means of payment in the acquisition of goods or services and which provides a technological solution or means of connection to the systems of the accredited parties for purposes of capturing and settling the transactions carried out by means of credit or debit cards; and (b) **Equipment**: electronic terminals or any other equipment, devices, information technology systems, computer programs, used by the **Client**, to enable credit and/or debit transactions; and (c) **Centralizing Entity:** Interbank Payment

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060.███.08- RG 8.222 837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just trd br- www.just.trd.br

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The
verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.                                                      Página 24 de 55



**Translation No. I-54727**
**Book No. 657**
**Page 186**

Chamber - CIP, the entity responsible for centralizing the registration, processing and transmission of information relating to the maintenance of banking domicile.

**7.** Once this authorization is signed, **Itaú** may request the **Centralizing Entity**, as from the date hereof, to maintain the banking domicile indicated in subsection 2.1, being liable to the **Client** for sending the information relating to such banking domicile maintenance.

8. The maintenance of banking domicile may only be cancelled before the date set forth in subsection 2.3 upon notice from **Itaú** to the **Centralizing Entity**. As from the business day following cancellation of the maintenance of banking domicile pursuant to the authorization of **Itaú**, or as from the maturity date indicated in sub-item 2.3, the **Client** may request the **Acquirers** to change the banking domicile indicated in sub-item 2.1.

(sgd)

**Client** RAKUTEN BRASIL FINANCIAL SERVI

Data of the **Client's** representatives:

| Name: | Name: |
|---|---|
| Taxpayer ID (CPF): | Taxpayer ID (CPF): |
| Identity Card (ID): | Identity Card (ID): |
| Title: | Title: |

Stamp: "Itaú – ACCOMMODATION – SÃO PAULO"

| FORMALIZATION – ITAU | |
|---|---|
| DONE | CHECKED |
| (sgd) | |

### EXHIBIT I TO THE AUTHORIZATION FOR CHANGE IN AND MAINTENANCE OF BANKING DOMICILE

| 22.366.799/0001-77 | |
|---|---|
| 24254-5 (page _/_) 01/15 | 1st counterpart: Itaú – 2nd counterpart: Client |

**Letterhead of the 4th Registry of Deeds and Documents and Civil Registry of Legal Entities of the Judicial District of São Paulo**

*Registrar: Robson de Alvarenga*

### REGISTRATION FOR PURPOSES OF PUBLICITY AND EFFECTIVENESS BEFORE THIRD PARTIES

#### No. 5.379.823 of 10/04/2019

**I certify** that the document in hard copy, containing **twenty-eight (28) pages,** was submitted on 10/04/2019, which was filed under No. 290.775, and electronically registered under No. **5.379.823** in Register B of this 4th Registry of Deeds and Documents of the Judicial District of São Paulo, on the date hereof.

**Nature:**

CREDIT CERTIFICATE

São Paulo, October 4, 2019

#### (ELECTRONICALLY SIGNED)

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688 - CPF 082.060.███.08 - RG 8.222 837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just trd br- www.just.trd.br

**Translation No. I-54727**
**Book No. 657**
**Page 187**

Sandra Regina Mattos Rudzit

TRADUTORA PÚBLICA

Carlos Augusto Peppe

Clerk

This certificate is an **integral and inseparable** part of the registration of the document described above.

| Emoluments | State | Treasury Office | Civil Registry | Court of Justice |
|---|---|---|---|---|
| R$8,671.83 | R$2,464.63 | R$l,686.89 | R$456.41 | R$595.16 |
| Public Prosecutor's Office | Tax on Services (ISS) | Conduction | Other Expenses | Total |
| R$416.24 | R$181.76 | R$0.00 | R$0.00 | R$14,472.92 |

| (QR Code) | To check the full contents of the document, access the website: **servicos.cdtsp.com.br/validarregistro** and inform the key below or use a QR code reader. 00181941345880384 | (QR Code) | To check the origin of this document, read the printed QR Code or access electronic address: **https://selodigital.tjsp.jus.br** Digital Stamp 1134804TIFC000073077BC19F |
|---|---|---|---|

*IN WITNESS WHEREOF I set my hand and seal to this translation.*

*São Paulo, September 16, 2021*

*Fees: R$4,474.41*

*Receipt No. 24020*

SANDRA REGINA MATTOS RUDZIT

Certified Translator

pgi/csi/305532.doc

SANDRA REGINA MATTOS RUDZIT - Tradutora Pública e Intérprete Comercial - Português - Inglês - Matrícula na JUCESP nº 1688- CPF 082.060▇▇▇08- RG 8.222 837-1
Rua Matias Aires, 402- 5° andar, cj. 51 - 01309-020- São Paulo - SP- Brasil - Fone/Fax: 55-11-3155-7383- e-mail: just@just trd br- www.just.trd.br

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.                    Página 26 de 55



# VIA BANCO

## INSTRUMENTO PARTICULAR DE CESSÃO FIDUCIÁRIA DE DIREITOS CREDITÓRIOS (RECEBÍVEIS DE CARTÃO DE CRÉDITO E DÉBITO) Nº 0041049965

## I – PREÂMBULO:

| CREDOR(ES) FIDUCIÁRIO(S) |
|---|

|x| **Itaú Unibanco S.A.,** , instituição financeira brasileira, agindo isoladamente ou por quaisquer de suas filiais, agências, sucursais e dependências, no Brasil ou no exterior,  com sede na Praça Alfredo Egydio de Souza Aranha, nº 100 - Torre Olavo Setúbal, São Paulo - SP, CNPJ nº 60.701.190/0001-04, doravante designado **Itaú Unibanco**;

|    | **Banco Itaucard S.A.,** com sede na Alameda Pedro Calil, 43, Poá, São Paulo, CNPJ nº 17.192.451/0001-70, doravante designado **Banco Itaucard;**

|    | **Banco Itauleasing S.A.,** com sede na Av. Antonio Massa, 361 – Centro – Poá/SP, CNPJ nº 49.925.225/0001-48, doravante designado **Banco Itauleasing.**

Sendo que, **Itaú Unibanco, Banco Itaucard** e **Banco Itauleasing** em conjunto serão designados "CREDORES FIDUCIÁRIOS" e individualmente CREDOR FIDUCIÁRIO.

| CEDENTE(S) |
|---|

**RAKUTEN BRASIL FINANCIAL SERVI**
AV FRANCISCO MATARAZZO, 1500 – CEP: 05001 – 100 - SAO PAULO/SP
CNPJ: 22.366.799/0001-77

| DEVEDORA(S) |
|---|

**RAKUTEN BRASIL FINANCIAL SERVI**
AV FRANCISCO MATARAZZO, 1500 – CEP: 05001 – 100 - SAO PAULO/SP
CNPJ: 22.366.799/0001-77

**BANDEIRAS:**

(    ) MasterCard, MasterCard Maestro, Diners Club International, Redeshop e outras bandeiras processadas pelas CREDENCIADORAS que sejam por ela informadas.

(X) Visa, VisaElectron e outras bandeiras processadas pelas CREDENCIADORAS que sejam por ela informadas.

(X) Hiper e outras bandeiras processadas pelas CREDENCIADORAS que sejam por ela informadas.

(    )          e outras bandeiras processadas pelas CREDENCIADORAS que sejam por ela informadas.

Durante toda a vigência da presente garantia de cessão fiduciária, a(s) CEDENTE(S) e a(s) DEVEDORA(S) obriga(m)-se a manter o valor da garantia equivalente, no mínimo, à:

☒ 100% da soma dos valores de principal mais acessórios das Obrigações Garantidas*.

☐ R$          (          )          .

☐ XXXXXX % (XXXXX por cento) da soma dos valores de principal mais acessórios das Obrigações Garantidas OU R$ XXXXX (XXXXXX reais) _____ que será calculado considerando os valores apurados no  Instrumento de Cessão Fiduciária n°. XXX, celebrado em XXX, entre XXXX

AUTENTICAÇÃO (SIM-II): CD3380D4-C083-4B27-B46A-0A75D1E02AE8
This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The
verification code at https://www.portaldeassinaturas.com.br 443 is 51ED-DD23-3D20-9547
ITAU_CESSAOFIDUCIARIA _CTO _DIREITOSCREDITORIOS /CARTÃO /SIMPLIFICADA /VERSÃOPES

e XXXX

☐ Outros:

(*) se houver obrigações em moeda estrangeira, sua conversão será realizada de acordo com o previsto no Anexo III.

A apuração dos Direitos Creditórios considerará:

☐ Fluxo

☒ Agenda

Periodicidade:

Tratando-se de Fluxo, ocorre mensalmente, mediante a totalização dos DIREITOS CREDITÓRIOS transitados na(s) CONTA VINCULADA(S) na periodicidade acima indicada.

Tratando-se de Agenda, ocorre diariamente, mediante a totalização dos DIREITOS CREDITÓRIOS performados, tanto os depositados em conta vinculada bem como àqueles performados ainda não recebidos pela(s) CEDENTE(S) FIDUCIÁRIA(S),   ainda não recebidos pela(s) CEDENTE(S) FIDUCIÁRIA(S) (ou seja, direitos creditórios de titularidade da (s) CEDENTE(S) FIDUCIÁRIA(S) decorrentes de vendas realizadas apenas com os cartões de crédito, mas ainda não liquidados pelas CREDENCIADORAS à(s) CEDENTE(S) FIDUCIÁRIA(S) na(s) respectiva(s) CONTA(S) VINCULADA(S), doravante denominados "DIREITOS CREDITÓRIOS").

Os recursos decorrentes da liquidação dos DIREITOS CREDITÓRIOS serão transferidos da(s) CONTA(S) VINCULADA(S) para a(s) respectiva(s) CONTA(S) MOVIMENTO(S) em até 1(um) dia útil contado do seu recebimento, observados os termos da Cláusula "Conta Vinculada e Conta Movimento" da presente Cessão Fiduciária, desde que a obrigação garantida não esteja vencida e que exista excedente de garantia acima do percentual mínimo indicado neste preâmbulo.

| Titular | Banco | Agência | Número |
|---------|-------|---------|--------|
| RAKUTEN   BRASIL FINANCIAL SERVI | 341 | 7307 | 15401 - 8 |

| Titular | Banco | Agência | Número |
|---------|-------|---------|--------|
| RAKUTEN   BRASIL FINANCIAL SERVI | 341 | 7307 | 09957 - 7 |

A integralidade das obrigações, devidamente atualizadas e acrescidas de todos os encargos, assumidas pela(s) DEVEDORA(S) decorrentes da(s) operação(ões) descritas no Anexo II, o qual poderá ser complementado, alterado, ratificado ou retificado a qualquer tempo.

## II – CLÁUSULAS

AUTENTICAÇÃO (SIM-II): CD3380D4-C083-4B27-B46A-0A75D1E02AE8
This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.
ITAU _CESSÃOFIDUCIÁRIA _CTO _DIREITOSCREDITÓRIOS /CARTÃO /SIMPLIFICADA /VERSÃOPES

Página 2 de 16    Página 28 de 55

**Da Cessão Fiduciária** – Por este Instrumento Particular de Cessão Fiduciária de Direitos Creditórios ("Cessão Fiduciária"), em garantia de todas as Obrigações Garantidas assumidas pela(s) DEVEDORA(S) junto ao(s) CREDOR(ES), incluindo mas não se limitado aos eventuais aditamentos e prorrogações às obrigações principais e acessórias, inclusive moratórias, presentes ou futuras, assumidas ou que venham a ser assumidas pela(s) DEVEDORA(S), a(s) CEDENTE(S) cede(m) e transfere(m) ao(s) CREDOR(ES), em caráter irrevogável e irretratável, em cessão fiduciária em garantia, nos termos do artigo 66-B da Lei 4.728/65 e demais legislação aplicável, a propriedade fiduciária, o domínio resolúvel e a posse indireta dos títulos e demais documentos representativos dos Direitos Creditórios descritos no preâmbulo deste instrumento.

**Parágrafo Único** – A transferência da propriedade fiduciária dos Direitos Creditórios pela(s) CEDENTE(S) ao(s) CREDOR(ES) vigorará até o integral cumprimento das Obrigações Garantidas, restando claro que o seu cumprimento parcial não importará na exoneração proporcional da Cessão Fiduciária.

**Dos Direitos Creditórios** – A garantia ora constituída é composta presentes e futuros, detidos pela(s) CEDENTE(S) contra quaisquer credenciadoras participantes do Sistema de Controle de Garantias de Cartões – SCG ("Credenciadoras") e da da Câmara Interbancária de Pagamentos – CIP, decorrentes de aquisições de bens ou serviços fornecidos e/ou prestados pela(s) CEDENTE(S) e pagos pelos compradores com o uso dos cartões de crédito e/ou débito das bandeiras definidas abaixo, nos respectivos CNPJs da(s) CEDENTE(S), conforme relacionados na Autorização (definida na Cláusula "Dos Direitos Creditórios") emitida para cada uma da(s) CEDENTE(S), e os Recebíveis depositados na(s) Conta(s) Vinculada(s), incluindo todo e qualquer recurso nela(s) depositado.

**Parágrafo Primeiro** – Os direitos creditórios decorrentes dos Recebíveis, inclusive os relativos a pagamento antecipado de créditos futuros detidos pela(s) CEDENTE(S) contra as Credenciadoras, serão depositados pelas Credenciadoras exclusivamente na(s) Conta(s) Vinculada(s), em decorrência da adesão da(s) CEDENTE(S) ao Contrato de Credenciamento e Adesão de Estabelecimento ao Sistema de cada Credenciadora ("Contrato de Credenciamento") e ao disposto na "Autorização para Alteração e Manutenção de Domicílio Bancário", emitida(s) para cada uma da(s) CEDENTE(S) ("Autorização"), entregue(s), na presente data, ao(s) CREDOR(ES), com a descrição das bandeiras e dos respectivos CNPJs autorizados para terem seus domicílios mantidos junto ao(s) CREDOR(ES) e cujo modelo consta como <u>Anexo I</u> do presente instrumento (anexo e parte integrante deste instrumento, que será emendado/substituído, e também averbado/registrado no cartório competente).

**Parágrafo Segundo** – A(s) Conta(s) Vinculada(s), para todos os fins e efeitos desta Cessão Fiduciária, do Contrato de Credenciamento e da(s) Autorização(ões), passam a ser o(s) respectivo(s) domicílio(s) bancário(s) da(s) CEDENTE(S) ("Domicílio(s) Bancário(s)".

**Parágrafo Terceiro** – Os Recebíveis recebidos diretamente das Credenciadoras pela(s) CEDENTE(S) serão considerados de propriedade fiduciária e resolúvel do(s) CREDOR(ES), não integrando o patrimônio da(s) CEDENTE(S). A(s) CEDENTE(S) será(ão) considerada(s) mera(s) detentora(s) desses valores, ficando obrigada(s) a transferi-los para a(s) sua(s) respectiva(s) Conta(s) Vinculada(s) imediatamente após o seu recebimento.

AUTENTICAÇÃO (SIM-II): CD3380D4-C083-4B27-B46A-0A75D1E02AE8
This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The
verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.
ITAU _CESSÃOFIDUCIARIA _CTO _DIREITOSCREDITÓRIOS /CARTÃO /SIMPLIFICADA /VERSÃOPES
Página 3 de 16
Página 29 de 55

**Parágrafo Quarto** – Caso não exista mais saldo devedor em aberto, seja pela extinção das Obrigações Garantidas contratadas ou por qualquer outra razão, o(s) **CEDENTES(S) FIDUCIÁRIO(S)** poderão solicitar a destrava dos recebíveis e sua consequente liberação, que será feita em até 03 (três) dias úteis contados a partir da data do pedido.

**Da Conta Vinculada e Conta Movimento** – O produto da cobrança dos Recebíveis deverá ser creditado na(s) respectiva(s) Conta(s) Vinculada(s), conforme indicadas no Preâmbulo deste instrumento.

**Parágrafo Primeiro** – A(s) Conta(s) Vinculada será(ão) movimentada(s) exclusivamente pelo(s) CREDOR(ES) visando a gestão dos recursos recebidos em razão desta garantia, podendo o(s) CREDOR(ES) efetuar saques, aplicar, debitar quantias e resgatar os recursos mantidos na(s) Conta(s) Vinculada(s), sempre e a qualquer tempo, conforme os termos e condições estabelecidos nesta Cessão Fiduciária e no "Termos e Condições de Conta de Depósitos Vinculados", documento que rege as condições de abertura e utilização da Conta Vinculada e que encontra-se registrado no 7º. Ofício de Registro de Títulos e Documentos e Civil de Pessoa Jurídica da Capital do Estado de São Paulo, sob nº. 1.814.492.

**Parágrafo Segundo** – Enquanto a(s) DEVEDORA(S) e a(s) CEDENTE(S) estiver(em) adimplente(s) com as Obrigações Garantidas e as demais obrigações assumidas na presente Cessão Fiduciária, o(s) CREDOR(ES) transferirá(ão) todos os recursos depositados na(s) Conta(s) Vinculada para a(s) Conta(s) Movimento, no prazo indicado no Preâmbulo deste instrumento.

**Da Antecipação**

Caso a(s) CEDENTE(S) efetuem a antecipação dos recebíveis objeto desta garantia, nos termos da regulamentação do Banco Central - BACEN, os recebíveis poderão ser retidos por até 2 (dois) dias úteis. Após este prazo, o(s) CREDOR(ES) poderão, a seu critério: (i) utilizar o produto da antecipação para amortização do saldo devedor da operação de crédito ou (ii) liberados ao usuário final.

**Parágrafo Primeiro** – Se, em razão da antecipação prevista no parágrafo acima, o(s) CREDOR(ES), a seu exclusivo critério, julgarem existir potencial deterioração do risco de crédito das operações garantidas, ou alteração relevante no estado econômico financeiro da(s) CEDENTE(S) ou do DEVEDOR(ES) de modo a comprometer o adimplemento das obrigações garantidas, os valores decorrentes da antecipação serão aplicados na liquidação total ou parcial das obrigações garantidas.

**Parágrafo Segundo** – O pagamento da liquidação antecipada deverá consistir no valor de principal e juros não amortizados, atualizados até a data da liquidação antecipada, com base nos encargos pactuados no título das obrigações garantidas, acrescido ainda de indenização para liquidação antecipada e dos tributos eventualmente incidentes.

**Parágrafo Terceiro** – A indenização para liquidação antecipada será obtida pela diferença positiva, se houver, entre (i) valor presente do fluxo de pagamentos de principal e juros vincendos, calculado mediante o deságio do fluxo previsto nas obrigações garantidas, com base na taxa de juros vigente para a aplicação de mesmo montante pelo período compreendido entre a data da liquidação antecipada e as datas de vencimento originalmente pactuadas nas obrigações garantidas e (ii) valor de principal e juros não

amortizados atualizados até a data da liquidação antecipada, com base nos encargos pactuados no título das obrigações garantidas

**Da Razão de Garantia** – Durante toda a vigência da Cessão Fiduciária, o valor dos Direitos Creditórios deverá representar, no mínimo, ao Percentual Mínimo da Garantia definido no preâmbulo deste instrumento.

**Parágrafo Primeiro** – A apuração do Percentual Mínimo da Garantia será realizada observando as condições definidas no preâmbulo, mediante: (i) a soma do total dos recursos transitados na(s) Conta(s) Vinculada(s) dentro da Periódicidade de Apuração (modalidade de apuração que será, antes e doravante, simplesmente denominada "Fluxo"); ou (ii) a soma do total dos Recebíveis decorrentes de vendas realizadas apenas com os cartões de crédito, ou seja, direitos creditórios de titularidade da(s) CEDENTE(S), mas ainda não liquidados pelas Credenciadoras na(s) respectiva(s) Conta(s) Vinculada(s) (modalidade de apuração que será, antes e doravante, simplesmente denominada "Agenda".

**Parágrafo Segundo** – Quando estabelecido que o Percentual Mínimo da Garantia será apurado de acordo com a modalidade Agenda (conforme selecionado no Preâmbulo deste instrumento), será fornecido ao(s) CREDOR(ES), a fim de viabilizar o controle do valor dos Recebíveis, acesso ao(s) sistema(s) disponibilizado(s) pelas Credenciadoras ou outra forma acessível pelo(s) CREDOR(ES), sendo certo que na impossibilidade de acesso, pelo(s) CREDOR(ES), ao(s) sistema(s) das Credenciadoras responsáveis pelo pagamento dos Recebíveis, a(s) CEDENTE(S) se obriga(m) a fornecer ao(s) CREDOR(ES) na Periodicidade de Apuração planilha eletrônica contendo a relação de todos os Recebíveis performados previstos para recebimento.

**Parágrafo Terceiro** – A antecipação de valores objeto desta garantia, feita nos termos da regulametação do Banco Central – BACEN e de acordo com o estabelecido na cláusula Da Antecipação deste instrumento **não** prejudicará a apuração do percentual mínimo de garantia, tampouco representará qualquer renúncia às condições de vencimento antecipado ou tolerância em relação ao descumprimento, ainda que o credor decida, por mera liberalidade, amortizar o saldo devedor da operação conforme previsto nos parágrafos segundo e terceiro da cláusula Da Antecipação.

**Das Declarações** – Não obstante às demais disposições desta Cessão Fiduciária, a(s) **CEDENTE(S)**, neste ato e até o término da vigência da presente Cessão Fiduciária, assume(m) as seguintes obrigações e faz(em) as seguintes declarações, cuja veracidade é condição e causa essencial para a celebração desta Cessão Fiduciária por parte do(s) **CREDOR(ES)**:

a) a(s) CEDENTE(S) é(são) a(s) legítima(s) titular(es) dos Direitos Creditórios, os quais se encontram isentos de quaisquer ônus, alienação, caução, penhor, encargos ou gravames de qualquer natureza, legais ou convencionais, excetuando-se o decorrente desta Cessão Fiduciária;

b) a(s) CEDENTE(S) está(ão) devidamente autorizada(s) a celebrar a presente Cessão Fiduciária e a cumprir com todas as obrigações nesta previstas, tendo sido satisfeitos todos os requisitos legais e estatutários necessários para a presente contratação;

**c)** a(s) CEDENTE(S) e a(s) DEVEDORA(S) comprometem-se a praticar todos os atos e assinar todo e qualquer documento necessário à manutenção da presente desta Cessão Fiduciária, bem como a apresentar ao(s) CREDOR(ES) a presente Cessão Fiduciária e seus anexos ou aditivos devidamente registrado(s) junto ao(s) Cartório(s) de Títulos e Documentos localizado na sede da(s) CEDENTE(S) e da(s) DEVEDORA(S) no prazo máximo de 10 (dez) dias contados da assinatura do instrumento, ou em prazo diverso conforme negociado com o CREDOR;

**d)** a(s) CEDENTE(S) obriga(m)-se a reforçar, substituir, repor ou complementar a presente garantia, cedendo novos direitos de mesma natureza e com as mesmas condições dos Recebíveis, com outras garantias a critério do(s) CREDOR(ES), no prazo solicitado neste sentido, caso o valor dos Direitos Creditórios venha a se tornar inferior ao Percentual Mínimo da Garantia, ou forem objeto ou ameaçados de penhora, sequestro, arresto ou qualquer outra medida judicial ou administrativa, ou ainda, se sofrerem depreciação, deterioração, desvalorização, turbação, esbulho ou se tornarem inábeis, impróprios, imprestáveis ou insuficientes para assegurar o cumprimento das obrigações principais e acessórias, de responsabilidade da(s) DEVEDORA(S), decorrentes das Obrigações Garantidas;

**e)** a(s) CEDENTE(S) obriga(m)-se a não ceder, transferir, renunciar, gravar, arrendar, locar, dar em usufruto ou comodato, alterar, encerrar ou onerar ou de qualquer outra forma alienar ou dispor do(s) seu(s) respectivo(s) Domicílio(s) Bancário(s), a não substituir qualquer uma das Credenciadoras por outras empresas de credenciamento que não estejam cadastrada na CIP, a não antecipar quaisquer Recebíveis junto às Credenciadoras, nem a permitir que seja alterada qualquer cláusula ou condição do respectivo contrato de abertura de conta corrente ou do Contrato de Credenciamento, nem a praticar qualquer ato, ou abster-se de praticar qualquer ato, que possa, de qualquer forma, resultar na alteração, encerramento ou oneração do(s) seu(s) Domicílio(s) Bancário(s), ou na alteração, expressa ou tácita, do respectivo contrato de abertura de conta corrente ou do Contrato de Credenciamento, sem a prévia e expressa anuência do(s) CREDOR(ES);

**f)** a(s) CEDENTE(S) autoriza(m) o(s) CREDOR(ES) a solicitar à CIP a manutenção do(s) seu(s) respectivo(s) Domicílio(s) Bancário(s) para o recebimento dos Recebíveis até a liquidação de todas as obrigações advindas das Obrigações Garantidas, bem como adotar todas as medidas necessárias junto, à CIP e demais Credenciadoras para cumprimento da(s) Autorização(ões); e

**g)** a(s) CEDENTE(S) autoriza(m) o(s) CREDOR(ES) a ter(em) acesso às informações mantidas junto às Credenciadoras, especialmente aquelas relativas aos seguintes dados: (i) código do banco, (ii) data da solicitação da manutenção do domicílio, (iii) número do Ponto de Venda (PV), (iv) CNPJ do cliente, (v) tipo de transação (crédito ou débito), (vi) código BACEN do banco, agência, e conta bancária a serem mantidas, (vii) Prazo da manutenção do domicílio; (viii) valores estimados para pagamento por bandeira, (ix) data prevista para pagamento, (x) dados do favorecido (banco, agência bancária e conta bancária em que está programado para ocorrer).

**Parágrafo Único** – As declarações e obrigações previstas acima subsistirão durante toda a vigência da presente Cessão Fiduciária e serão automaticamente aplicáveis com relação a

quaisquer Direitos Creditórios adicionais que forem entregues ao(s) CREDOR(ES) nos termos da presente Cessão Fiduciária.

**Das Causas de Inadimplemento** – As Partes concordam que a ocorrência de quaisquer dos seguintes eventos serão causa direta para o aumento indevido do risco de crédito assumido pelo(s) CREDOR(ES) nas Obrigações Garantidas e na presente Cessão Fiduciária ("Depreciação do Crédito"), ensejando o direito de o(s) CREDOR(ES), automaticamente, e independentemente de prévia notificação, ou interpelação, judicial ou extrajudicial (i) reter(em) na(s) Conta(s) Vinculada(s) os valores decorrentes da liquidação dos Direitos Creditórios até que seja sanado o evento de Depreciação do Crédito, a critério satisfatório do(s) CREDOR(ES); e/ou (ii) excutir parcialmente a presente garantia, nos termos da Cláusula "Da Excussão da Garantia Fiduciária" desta Cessão Fiduciária, para liquidação das parcelas vencidas e das vincendas das Obrigações Garantidas, quando de seus respectivos vencimentos; e/ou (iii) vencer antecipadamente as Obrigações Garantidas e excutir a presente garantia, nos termos da Cláusula "Da Excussão da Garantia Fiduciária" desta Cessão Fiduciária:

a) falta de cumprimento pela(s) DEVEDORA(S) ou pela(s) CEDENTE(S), no prazo e pela forma devidos, de qualquer obrigação, principal ou acessória, de caráter pecuniário ou não pecuniário, contraída perante o(s) CREDOR(ES) em decorrência das Obrigações Garantidas, desta Cessão Fiduciária ou de qualquer outro instrumento celebrado pela(s) DEVEDORA(S) ou pela(s) CEDENTE(S) com o(s) CREDOR(ES) e/ou com qualquer outra empresa ligada, coligada, controlada e/ou controladora, de forma direta e/ou indireta, pelo(s) CREDOR(ES);

b) se qualquer declaração feita pela(s) DEVEDORA(S) ou pela(s) CEDENTE(S) nas Obrigações Garantidas ou nesta Cessão Fiduciária, conforme o caso, for incorreta, inexata ou enganosa em qualquer aspecto material, sem prejuízo das perdas e danos devidas pelo respectivo declarante;

c) se a(s) CEDENTE(S) tiver(em) requerida e/ou decretada sua falência, for(em) dissolvida(s) ou sofrer(em) legítimo protesto de título por cujo pagamento seja(m) responsável(is), ainda que na condição de garantidora(s), ou ainda se vierem a óbito ou sofrerem interdição, se pessoas naturais;

d) se a(s) CEDENTE(S), propuser(em) plano de recuperação extrajudicial ao(s) CREDOR(ES) ou a qualquer outro credor ou classe de credores, independentemente de ter sido requerida ou obtida homologação judicial do referido plano; ou

e) se a(s) CEDENTE(S) ingressar(em) em juízo com requerimento de recuperação judicial, independentemente de deferimento do processamento da recuperação ou de sua concessão pelo juiz competente.

**Da Excussão da Garantia Fiduciária** – Ocorrido o inadimplemento ou mora da(s) DEVEDORA(S) ou da(s) CEDENTE(S) em quaisquer das obrigações assumidas nas Obrigações Garantidas ou na presente Cessão Fiduciária, o(s) CREDOR(ES), na qualidade de proprietário(s) fiduciário(s) dos Direitos Creditórios, exercerá(ão) sobre eles, bem como sobre o produto decorrente de sua cobrança, todos os poderes que lhe são assegurados pela legislação vigente, em especial os descritos no § 3º do art. 66-B da Lei nº. 4.728/65, inclusive os poderes "ad judicia" e "ad negotia", podendo vender, ceder, resgatar ou

transferir os Direitos Creditórios (ou valores/aplicações decorentes dos valores advindos dos mesmos), por qualquer forma, independentemente de leilão, hasta pública, avaliação prévia ou qualquer outra medida judicial ou extrajudicial, ficando para tanto autorizado(s) pela(s) DEVEDORA(S) e pela(s) CEDENTE(S), de forma irrevogável e irretratável, nos termos do artigo 684 do Código Civil, a praticar todos os atos necessários para transferir o produto decorrente da cobrança dos Direitos Creditórios, incluindo mas não limitado à movimentação e débito dos valores existentes na(s) Conta(s) Vinculada(s), dar quitação e assinar quaisquer documentos ou termos, por mais especiais que sejam, necessários à prática dos atos aqui referidos, tudo sem necessidade de dar qualquer prévio aviso ou notificação à(s) DEVEDORA(S) ou à(s) CEDENTE(S). Tal procedimento não obstará a cobrança do mesmo via execução, de acordo com o disposto na legislação pertinente, caso exista saldo devedor pendente. Em havendo saldo credor remanescente, será ele, desde logo, colocado à disposição da(s) CEDENTE(S).

**Parágrafo Primeiro** – Na hipótese prevista no *caput* desta cláusula, o(s) CREDOR(ES), a seu critério, aplicará(ão) o produto da venda dos Direitos Creditórios e os valores existentes na(s) Conta(s) Vinculada(s), na liquidação parcial ou total das Obrigações Garantidas, permanecendo a(s) DEVEDORA(S) responsável(eis) pelo pagamento de eventual saldo remanescente, no prazo indicado pelo(s) CREDOR(ES) à(s) DEVEDORA(S).

**Parágrafo Segundo** – Caso haja Obrigações Garantidas ainda não vencidas quando da excussão da garantia, o(s) CREDOR(ES) manterá(ão) consigo os recursos que sobejarem da referida execução até final e total liquidação das Obrigações Garantidas, podendo, ao seu critério, utilizar tais recursos para aplicação em títulos e/ou investimentos, que integrarão, juntamente com seus rendimentos, a garantia de Cessão Fiduciária.

**Parágrafo Terceiro** – A(s) CEDENTE(S), em caráter irrevogável e irretratável, na forma da legislação pertinente, autoriza(m) o(s) CREDOR(ES) a aplicar(em), na amortização parcial ou liquidação total das Obrigações Garantidas, quaisquer importâncias creditadas na(s) Conta(s) Vinculada(s), ou, caso o saldo apresentado nessa(s) conta(s) não seja suficiente para liquidação das obrigações, a(s) CEDENTE(S) e a(s) DEVEDORA(S) autoriza(m) em caráter irrevogável e irretratável a utilização de quaisquer importâncias levadas a crédito nas Conta(s) Vinculada(s) mantida(s) junto ao(s) CREDOR(ES) e/ou com qualquer outra empresa ligada, coligada, controlada e/ou controladora, de forma direta e/ou indireta, pelo(s) CREDOR(ES).

**Parágrafo Quarto** – Para efeitos do disposto nesta cláusula, a(s) CEDENTE(S) outorga(m) ao(s) CREDOR(ES), em caráter irrevogável e irretratável, todos os poderes para (i) requerer registros ou averbações junto a repartições e cartórios competentes, bem como todo e qualquer órgão ou entidade, público ou privado, que se fizer necessário à devida manutenção desta garantia, (ii) firmar, em nome desta(s), todo e qualquer documento e (iii) praticar todo e qualquer ato ou negócio necessário ao cumprimento dos poderes acima.

**Parágrafo Quinto** – Na hipótese da presente Cessão Fiduciária conter mais de uma DEVEDORA, poderá(ão) o(s) CREDOR(ES) exercer seus direitos de crédito na ocorrência do disposto no item "Causas de Inadimplemento" em relação a todas as DEVEDORAS e suas Obrigações Garantidas.

**Das Disposições Gerais** – As Partes acordam as seguintes disposições gerais:

**Parágrafo Primeiro** – As Partes concordam que qualquer alteração desta Cessão Fiduciária somente poderá ser feita mediante instrumento escrito assinado pelas Partes.

**Parágrafo Segundo** – A(s) CEDENTE(S) desde já autoriza(m), em caráter irrevogável e irretratável, o(s) CREDOR(ES) a efetuar as devidas movimentações em sua(s) respectiva(s) Conta(s) Movimento, conforme indicada(s) no preâmbulo deste instrumento, quando esta(s) apresentar(em) saldo suficiente, para o pagamento de toda e qualquer despesa incorrida pelo(s) CREDOR(ES) na preparação, celebração, registro da presente Cessão Fiduciária, averbação dos seus respectivos anexos e eventuais aditamentos, incluindo, mas não limitado, aos encargos relativos aos demais atos e documentos que venham a ser exigidos perante as repartições e cartórios competentes para o regular exercício de qualquer direito decorrente da garantia ora constituída.

**Parágrafo Terceiro** – Todas as notificações, requerimentos, demandas ou outras comunicações deverão ser feitas por escrito e entregues pessoalmente ou enviadas por correio eletrônico, ou por carta registrada, nos endereços indicados no preâmbulo, ou a qualquer outro endereço que as Partes designarem previamente por escrito.

**Parágrafo Quarto** – A presente Cessão Fiduciária é celebrada em caráter irrevogável e irretratável, obrigando as Partes, bem como seus herdeiros e sucessores a qualquer título, sendo que a abstenção do exercício de qualquer direito ou faculdade assegurada por esta Cessão Fiduciária, pelas Obrigações Garantidas ou pela lei ao(s) CREDOR(ES), bem como eventual tolerância para com eventuais atrasos no cumprimento de quaisquer das obrigações assumidas pela(s) DEVEDORA(S) ou pela(s) CEDENTE(S) na presente Cessão Fiduciária ou nas Obrigações Garantidas não significarão novação ou derrogação de qualquer cláusula desta Cessão Fiduciária.

**Do Foro** – Com renúncia aos demais, por mais privilegiados que sejam, as Partes elegem o Foro da Capital do Estado de São Paulo para dirimir quaisquer questões oriundas desta Cessão Fiduciária, ficando reservado ao(s) CREDOR(ES) o direito de escolher o foro da situação dos Direitos Creditórios ou do domicílio da(s) CEDENTE(S).

O presente instrumento é emitido em 03 (três) vias de igual teor e assinado pelas partes qualificadas no preâmbulo, na presença das testemunhas abaixo.

São Paulo, 06 DE AGOSTO DE 2019.

Mario Eugenio Mori
007958713

Thais Milani
Relationship Manager
006160006

*Itaú Unibanco S.A.*
**CREDOR**

**RAKUTEN BRASIL FINANCIAL SERVI**
DEVEDORA/CEDENTE

Itaú
ABONADO
SÃO PAULO

Testemunhas:

1.
RG:
CPF:
Aluisio Ladeira de C. L. Filho
Func - 004509559
CPF - 069.172.576-48

2. Ronaldforan
RG: 378563234
CPF: 39304518 6

AUTENTICAÇÃO (SIM-II): CD3380D4-C083-4B27-B46A-0A75D1E02AE8
This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.
ITAU _CESSÃOFIDUCIÁRIA _CTO _DIREITOSCREDITÓRIOS /CARTÃO /SIMPLIFICADA /VERSÃOPES

**ANEXO I AO**
**INSTRUMENTO PARTICULAR DE CESSÃO FIDUCIÁRIA DE DIREITOS CREDITÓRIOS**
**Nº 0041049965**
**- Recebíveis de Cartões de Crédito e Débito -**

## AUTORIZAÇÃO PARA ALTERAÇÃO E MANUTENÇÃO DE DOMICÍLIO BANCÁRIO

### 1. Dados do Cliente

| 1.1. Nome empresarial | 1.2. CNPJ Nº |
|---|---|
| RAKUTEN BRASIL FINANCIAL SERVI | 22.366.799/0001-77 |

### 2. Dados desta autorização

| 2.1. Estabelecimentos Comerciais: (CNPJ Nº.) | 2.2. Domicílio bancário a ser mantido | | |
|---|---|---|---|
| | Agência | Conta | Bandeira |
| | | | |
| 22.366.799/0001-77 | 7307 | 15401 - 8 | Visa / Hiper |

2.3. Bandeiras:

Mastercard: Mastercard, Mastercard Maestro, Redeshop, Dinners e outras bandeiras processadas pelas Credenciadoras que sejam por elas informadas ao **Itaú Unibanco**;
Visa: Visa, Visaelectron e outras bandeiras processadas pelas Credenciadoras que sejam por elas informadas ao **Itaú Unibanco**.
Hiper e outras bandeiras processadas pelas Credenciadoras que sejam por elas informadas ao **Itaú Unibanco**

2.4. Data de vencimento da manutenção de domicílio

ATÉ FINAL E INTEGRAL LIQUIDAÇÃO DA OPERAÇÃO GARANTIDA

2.5. Data e local de emissão

06/08/2019 – SÃO PAULO,SP

**3.** O **Cliente** identificado no item 1 autoriza o **Itaú Unibanco S.A.**, com sede na Praça Alfredo Egydio de Souza Aranha, nº 100 - Torre Olavo Setúbal, São Paulo, SP, CNPJ n.º 60.701.190/0001-04, designado "**Itaú Unibanco**", a:

(i)     notificar, através deste instrumento e nos termos do artigo 290 do Código Civil Brasileiro, as Credenciadoras de que, em garantia de operação de crédito, o Cliente cedeu fiduciariamente ao **Itaú Unibanco** seus direitos de crédito, presentes e futuros, decorrentes de todas as transações com cartões de crédito e débito dos CNPJs e Bandeiras indicados nos subitens 2.1 e 2.2;

(ii)     alterar o domicílio bancário indicado atualmente vigente para o novo domicílio bancário indicado no subitem 2.2, mantido pelo Cliente no **Itaú Unibanco**;

(iii)     solicitar à CIP a manutenção do domicílio bancário indicado no subitem 2.2, a partir desta data e até a data do subitem 2.4, relativamente às espécies de transações de crédito e débito, relativas às Bandeiras indicadas no subitem 2.2. Caso esse domicílio bancário esteja vinculado à cadeia centralizadora do Cliente (centralização do fluxo dos direitos de crédito de mais de uma pessoa jurídica

_____ translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP ___ ___D20-9547.

do mesmo grupo societário e/ou econômico do Cliente em apenas um Domicílio Bancário), o Cliente autoriza o **Itaú Unibanco** a adotar todas as medidas necessárias perante a CIP para a manutenção de todos os demais domicílios bancários do Cliente que estejam relacionados ou sujeitos à mesma cadeia centralizadora, ainda que esses domicílios bancários não tenham sido expressamente indicados pelo Cliente nesta autorização ou, na impossibilidade da manutenção de todos os demais domicílios bancários, nos termos indicados nesse item, solicitar às Credenciadoras o desmembramento da cadeia centralizadora, para que seja possível a manutenção de domicílio bancário indicado nesta autorização;

(iv)   adotar todas as medidas necessárias perante às Credenciadoras para a manutenção de todos os domicílios bancários do Cliente que tenham a mesma agência e conta corrente (subitem 2.2) e o mesmo CNPJ (subitem 2.1.2) nos sistemas das Credenciadoras;

(v)   solicitar a manutenção de domicílio bancário objeto desta autorização à Câmara Interbancária de Pagamentos – CIP, entidade responsável pela centralização do registro, processamento e transmissão de informações relativas à manutenção de domicílio bancário (designada Centralizadora);

**4.**   Se a(s) operação(ões) de crédito celebrada(s) pelo **Cliente** com o **Itaú Unibanco** puder(em) ser renovada(s) ou tiver(em) seu vencimento em data superior a 36 (trinta e seis) meses, o **Cliente** autoriza o **Itaú Unibanco** a solicitar às **Credenciadoras** a renovação da manutenção de domicílio bancário quantas vezes forem necessárias, até a final e integral liquidação da(s) referida(s) operação(ões) de crédito, independentemente da formalização de novo termo de autorização de manutenção de domicílio bancário.

**5.**   Na hipótese de resilição ou rescisão do **Contrato de Credenciamento**, o **Cliente** autoriza as **Credenciadoras** a continuar a efetuar o depósito dos créditos indicados no item 2 no nosso domicílio bancário indicado no subitem 2.2 até a data indicada no subitem 2.4.

**6.**   O **Cliente** e o **Itaú Unibanco** reconhecem que:

**6.1.** a assinatura desta autorização é condição para que as **Credenciadoras** cumpram, concomitantemente, o **Contrato de Credenciamento** e o Contrato de Manutenção de Domicílio Bancário celebrado entre elas e **Itaú Unibanco**; e

**6.2.** as **Credenciadoras** poderão exigir o cumprimento das obrigações aqui constantes nos termos dos artigos 436 e 437 do Código Civil.

**7.**   O **Cliente** declara-se ciente de que:

(i)   a manutenção de domicílio bancário indicada nesta autorização vinculará todas as transações relativas às Bandeiras indicadas no subitem 2.2, independentemente da **Credenciadora** responsável pela captura, pelo processamento e pela liquidação das referidas transações;

(ii)   as **Credenciadoras**, até a data do subitem 2.4, não celebrarão operações que vise a antecipação de créditos de ponto de venda cujo domicílio bancário esteja sujeito à manutenção, nos termos aqui indicados, salvo mediante prévia e expressa autorização do **Itaú Unibanco**;

(iii)   as transações de crédito e débito de qualquer das Bandeiras indicadas no subitem 2.2 poderão ser capturadas por uma mesma Credenciadora, por intermédio de um mesmo Equipamento;

(iv)   a manutenção de domicílio bancário prevista nesta autorização será processada pelo **Itaú Unibanco**, pelas Credenciadoras e pela **Centralizadora** em conformidade com as disposições da Convenção para Regulamentação e Proteção de Garantias de Recebíveis – "Sistema de Controle de Garantias", cujos termos e condições o **Cliente** declara conhecer.

**7.1.** Para os fins desta autorização, entende-se por: (a) **Credenciadora:** toda e qualquer pessoa jurídica que credencia pessoas físicas ou jurídicas para aceitação de cartões de crédito ou débito como meios eletrônicos de pagamento na aquisição de bens e/ou serviços e que disponibiliza solução tecnológica e/ou meios de conexão

aos sistemas dos credenciados para fins de captura e liquidação das transações efetuadas por meio de cartões de crédito ou débito; e (b) **Equipamentos**: terminais eletrônicos ou quaisquer outros aparelhos, dispositivos, sistemas de informática, programas de computador (incluindo, mas não se limitando ao terminal POS), utilizados pelo **Cliente**, para possibilitar a realização de transações de crédito e/ou débito

8. Uma vez assinada esta autorização, o **Itaú Unibanco** poderá solicitar à CIP, a partir desta data, a manutenção do domicílio bancário indicado no subitem 2.2, sendo responsável perante o **Cliente** pelo envio das informações relacionadas a tal manutenção de domicílio bancário.

9. A solicitação de manutenção de domicílio bancário poderá ser imediatamente processada pela **CIP.**

10. A manutenção de domicílio bancário somente poderá ser cancelada antes da data indicada no subitem 2.4 mediante notificação do **Itaú Unibanco** às **Credenciadoras.** A partir do dia útil seguinte ao cancelamento da manutenção de domicílio bancário conforme autorização do **Itaú Unibanco**, ou da data de vencimento indicada no subitem 2.4, o **Cliente** poderá solicitar às **Credenciadoras** a alteração do domicílio bancário indicado no subitem 2.2.

**Cliente:** RAKUTEN BRASIL FINANCIAL SERVI

Dados dos representantes do **Cliente:**

Nome: _____
CPF: _____
RG: _____
Cargo: _____


Nome: _____
CPF: _____
RG: _____
Cargo: _____


Itaú
**ABONADO**
SÃO PAULO

This certification certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP nº ...D20-9547

## ANEXO II AO
## INSTRUMENTO PARTICULAR DE CESSÃO FIDUCIÁRIA DE DIREITOS CREDITÓRIOS
## (RECEBÍVEIS DE CARTÃO DE CRÉDITO E DÉBITO) Nº 0041049965

## DESCRIÇÃO DAS OBRIGAÇÕES GARANTIDAS

Para os efeitos da legislação aplicável, são garantidas pela "Cessão Fiduciária" as seguintes obrigações, que compõe o conceito de Obrigações Garantidas:

Nome do Instrumento: CÉDULA DE CRÉDITO BANCÁRIO Nº 730700346242
Credor: ITAÚ UNIBANCO S.A.
CNPJ: 60.701.190/0001-04
Devedora: RAKUTEN BRASIL FINANCIAL SERVI
CNPJ: 22.366.799/0001-77
Valor de Principal: R$ 65.000.000,00 (sessenta e cinco milhões de reais)
Juros: 0,19% a.m. (dezenove centésimos por cento ao mês), e demais encargos indicados no Instrumento.
Data de Emissão/Celebração do Instrumento: 06/08/2019 e seus eventuais aditamentos
Data de Vencimento: 26/08/2019. A Cessão Fiduciária deverá abranger eventuais prorrogações nos termos do instrumento.

Mario Eugenio Mori
007958713

Thais Milani
Relationship Manager
006160006

Itaú Unibanco S.A.
**CREDOR**

**RAKUTEN BRASIL FINANCIAL SERVI**
**DEVEDORA/CEDENTE**

TESTEMUNHAS:

1.
RG:   Aluisio Ladeira de C. L. Filho
        Func - 004509559
CPF:   CPF - 069.172.576-48

2.
RG: 378563294
CPF: 39304151064

Itaú
**ABONADO**
SÃO PAULO

| FORMALIZAÇÃO - ITAU | |
|---|---|
| FEITO | CONFERIDO |
| Dmc | |

This certification certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP registration ... the ... D20-9547

**ANEXO III AO**
**INSTRUMENTO PARTICULAR DE CESSÃO FIDUCIÁRIA DE DIREITOS CREDITÓRIOS**
**(RECEBÍVEIS DE CARTÃO DE CRÉDITO E DÉBITO) Nº MODELO**

A(s) DEVEDORA(S) e a(s) CEDENTE(S) declaram-se cientes e de acordo que:

A) Especificamente em havendo dentre as Obrigações Garantidas descritas no <u>Anexo II</u> operações em moeda estrangeira ou contratadas junto a filiais do **Itaú Unibanco S.A.** no exterior, além das cláusulas previstas na Cessão Fiduciária, aplicam-se também as seguintes cláusulas:

**i)** para fins da observância do Percentual Mínimo da Garantia, conforme definido na Cessão Fiduciária, o valor das Obrigações Garantidas será convertido da moeda estrangeira para moeda corrente brasileira à Taxa de Conversão (abaixo definida) aplicável em cada data de apuração, a qual terá lugar na Periodicidade de Apuração indicada na Cessão Fiduciária.

**ii)** entende-se por "Taxa de Conversão" a média das taxas de câmbio de venda da moeda estrangeira em que estão denominadas as Obrigações Garantidas, praticadas no mercado de câmbio no dia útil imediatamente anterior à Periodicidade de Apuração, média essa divulgada pelo Banco Central do Brasil por meio de seu "site" na internet.

**iii)** se, por qualquer motivo, a Taxa de Conversão deixar de existir ou de ser divulgada, a conversão será efetuada mediante utilização de taxa ou parâmetro aplicável a transações financeiras da mesma natureza das Obrigações Garantidas, que permita a aferição da exata equivalência, a qualquer tempo, da soma do valor dos Direitos Creditórios em relação ao Percentual Mínimo da Garantia, conforme aplicável. Esta taxa ou parâmetro será informada pelo Agente de Garantia (abaixo definido) à(s) CEDENTE(S) e a(s) vinculará.

**iv)** em caso de não pagamento, ou não cumprimento da Cessão Fiduciária ou das Obrigações Garantidas, fica(m) o(s) CREDOR(ES), agindo diretamente ou por intermédio do Agente de Garantia (abaixo definido), desde já, em caráter irrevogável, irretratável e como condição da Cessão Fiduciária, autorizado(s) a comprar moeda estrangeira com o produto da venda, cessão ou outro tipo de liquidação dos Direitos Creditórios e efetuar todas as remessas de tal moeda ao exterior, celebrar qualquer contrato de câmbio necessário com instituições financeiras no Brasil porventura indispensável à realização de tais remessas, e representar a(s) CEDENTE(S) perante o Banco Central do Brasil e qualquer outra autoridade governamental brasileira ou instituição financeira quando necessário à excussão da Cessão Fiduciária, objetivando o pagamento das Obrigações Garantidas.

**v)** Especificamente para as operações contratadas junto às filiais localizadas no exterior do **Itaú Unibanco S.A.**, a filial e/ou agência em <PREENCHER> do Itaú Unibanco S.A. (a "Filial no Exterior"), neste ato, nomeia e constitui o **Itaú Unibanco S.A.** (o "Agente de

INSTRUMENTO:
AUTENTICAÇÃO (SIM-II): CD3380D4-C083-4B27-B46A-0A75D1F02AE8
This translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP Reg. 910 / 2020-9547
ITAÚ _CESSAOFIDUCIARIA _CTO _DIREITOSCREDITORIOS /CARTÃO /SIMPLIFICADA /VERSÃOPES

Garantia") como seu mandatário para praticar qualquer ato e promover a cobrança de quaisquer valores decorrentes exclusivamente da presente Cessão Fiduciária e das Obrigações Garantidas nas quais figura como credora, podendo, para tanto, contratar e destituir advogados, com poderes "ad judicia", intimar, notificar, interpelar, transigir, desistir, receber e dar quitação, representando a sua Filial no Exterior extrajudicial ou judicialmente e em qualquer fase ou grau de jurisdição, com poderes, ainda, para praticar qualquer ato e assinar qualquer documento ou instrumento necessário ao cumprimento de suas funções de Agente de Garantia, bem como receber notificações e comunicações referentes à Cessão Fiduciária.

B) Especificamente em havendo a existência de operações de Adiantamento sobre Contrato de Câmbio (ACC) ou Adiantamento sobre Cambiais Entregues (ACE) entre as Obrigações Garantidas descritas no <u>Anexo II</u>, além das cláusula previstas na Cessão Fiduciária, aplica-se também a seguinte cláusula:

Caso dentre as Obrigações Garantidas descritas no <u>Anexo II</u> haja obrigações decorrentes de contratos de câmbio de exportação (cada contrato, conforme aditado, substituído ou complementado por instrumento de cancelamento ou baixa, será doravante designado "Contrato de Câmbio"), sob os quais a(s) DEVEDORA(S) recebeu(ram) ou receberá(ão) adiantamentos totais ou parciais de recursos por conta do preço, em moeda nacional, da moeda estrangeira comprada pelo(s) CREDOR(ES) para entrega futura (cada qual um "Adiantamento" e, coletivamente, "Adiantamentos", sendo o valor em moeda estrangeira de cada Adiantamento doravante designado "Valor em moeda estrangeira do Adiantamento"), aplicam-se as seguintes disposições:

(i)  a(s) CEDENTE(S) e a(s) DEVEDORA(S) declaram conhecer a legislação e regulamentação concernentes aos Contratos de Câmbio;
(ii)  sobre o Valor em moeda estrangeira do Adiantamento incidirão os Juros previstos no respectivo Contrato de Câmbio (os "Juros"), que deverão ser pagos pelo seu contravalor em moeda nacional calculado conforme a Taxa de Conversão (definida no item A (ii) acima);
(iii)  no caso de cancelamento de qualquer Contrato de Câmbio, a(s) DEVEDORA(S) deverá(ão) pagar ao(s) CREDOR(ES) o contravalor em moeda nacional do Valor em moeda estrangeira do Adiantamento acrescido dos Juros e calculado conforme a taxa de câmbio a ser acordada entre a(s) DEVEDORA(S) e o(s) CREDOR(ES);
(iv)  no caso de baixa de qualquer Contrato de Câmbio, a(s) DEVEDORA(S) deverá(ão) pagar ao(s) CREDOR(ES) o contravalor em moeda nacional do Valor em moeda estrangeira do Adiantamento acrescido dos Juros, calculado conforme a maior dentre as seguintes taxas: (i) a taxa de câmbio prevista no Contrato de Câmbio e (ii) a Taxa de Conversão;
(v)  em caso de baixa ou cancelamento de qualquer Contrato de Câmbio, a(s) DEVEDORA(S) deverá(ão) pagar os encargos financeiros determinados pelo Banco Central do Brasil e os tributos previstos na regulamentação e legislação aplicáveis;
(vi)  as Obrigações Garantidas abrangem, mas não se limitam, aos encargos financeiros previstos na legislação e regulamentação aplicáveis devidos em razão do

This translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1020-9547

cancelamento ou baixa de qualquer Contrato de Câmbio e ainda variação cambial positiva, juros, encargos, despesas, encargos moratórios, taxas e tributos incidentes, decorrentes ou relacionados aos Contratos de Câmbio e eventuais aditivos ou prorrogações; e

(vii) as cláusulas "Causas de Inadimplemento" e "Excussão da Garantia Fiduciária" da Cessão Fiduciária aplicam-se também no caso de cancelamento ou baixa de qualquer Contrato de Câmbio ou, ainda, na data em que eventualmente for exigida a devolução do Adiantamento concedido sob qualquer Contrato de Câmbio.

Todos os termos e expressões aqui escritos em letra maiúscula, mas aqui não definidos, terão os mesmos significados a eles atribuídos na Cessão Fiduciária. Todos os termos e expressões definidos poderão ser utilizados tanto no masculino quanto no feminino, e tanto no singular quanto no plural.

O presente Anexo III será parte integrante da referida Cessão Fiduciária sempre que dentre as Obrigações Garantidas houver alguma das operações aqui mencionadas.

Este Anexo III é emitido no mesmo número de vias da Cessão Fiduciária, as quais terão o mesmo teor e serão assinadas pelas partes, na presença de dua testemunhas abaixo indicadas:

<Local> , <data> .

Mario Eugenio Mori
007958713

Mario Eugenio M...
007958715

Thais Milani
Relationship Manager
006160006

Itaú Unibanco S.A. – CREDOR
Jucelia de Aquino Gom...
CPF: 227.143.488-23
RG: 34.207.137-9

VANILLA GREGORIO
RG: 26.892.800-9
CPF: 248.604.728-02

(indicar o veículo no exterior do Itaú Unibanco) – CREDOR

[CEDENTE] – CEDENTE

- DEVEDORA

FORMALIZAÇÃO - ITAU
FEITO      CONFERIDO

Itaú
ABONADO
SÃO PAULO

Testemunhas:

1. _____
RG
CPF

Aluisio Ladeira de C. L. Filho
Func - 004509559
CPF - 069.172.576-48

2. _____
RG 378663294
CPF 39304151864

This authentication certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP ... 9D20-9547.

 **Itaú Unibanco S.A.**

**Cédula de Crédito Bancário**
**Abertura de Crédito em Conta Corrente**
**(Conta Hot Mensal - Recebíveis de Cartão)**

| Nome empresarial do emitente |
|---|
| RAKUTEN BRASIL FINANCIAL SERVI  22 566 799 / 000 1-77 |

qualificado na Proposta de Abertura da Conta Corrente indicada no subitem 1.9, designado **Cliente**.

## 1. Dados desta Cédula de Crédito Bancário

| 1.1. Data de Emissão | 1.2. Conta Contratual | | | | 1.3. Limite de Crédito | 1.4. Vencimento desta Cédula | 1.5. Vencimento do Limite Crédito |
|---|---|---|---|---|---|---|---|
| | Agência | Conta nº | DAC | Categoria | | | |
| 06/08/2019 | 7307 | 34624 | 2 | 478-8 | R$ 65.000.000,00 | À VISTA | 26/08/2019 |

| 1.6. Comissão de Abertura de Crédito | 1.7. Taxa de Juros válida para esta data | | | |
|---|---|---|---|---|
| | 1.7.1. Por mês (30 dias) | 1.7.2. Ao ano (360 dias) | 1.7.3. Taxa Referencial | 1.7.4. Periodicidade da Capitalização |
| 0,00 % do limite de crédito | 0,19 % | 2,41 % | 100,00 % DI-Over (Extragrupo) | MENSAL |

| 1.8. Dia de Pagamento dos Encargos | 1.9. Conta Corrente | | | 1.10. Conta Vinculada | | | 1.11. Código da Garantia (uso interno do Itaú) |
|---|---|---|---|---|---|---|---|
| | Agência | Conta nº | DAC | Agência | Conta nº | DAC | |
| 30 | 7307 | 09957 | 7 | 7307 | 15401 | 8 | 418 |

| 1.12. Local de Emissão | 1.13. Local de Pagamento |
|---|---|
| SAO PAULO,SP | SAO PAULO,SP |

Na data da apresentação, que poderá ser feita dentro do prazo de 20 anos, o **Cliente** pagará por esta Cédula de Crédito Bancário ("Cédula"), ao **Itaú Unibanco S.A.**, com sede na Praça Alfredo Egydio de Souza Aranha, nº 100 - Torre Olavo Setúbal, São Paulo, SP, CNPJ n.º 60.701.190/0001-04, designado **Itaú**, a dívida em dinheiro, certa, líquida e exigível, correspondente ao valor total utilizado do limite de crédito aberto indicado no subitem 1.3 ("Limite"), mais os encargos previstos nesta Cédula.

Na data indicada no subitem 1.8 e no vencimento do limite indicado no subitem 1.5 o **Cliente** pagará ao **Itaú** os encargos e os valores utilizados do limite, nos termos desta Cédula.

2. **Objeto** - O **Itaú** concederá ao **Cliente** limite rotativo disponibilizado na Conta Corrente indicada no subitem 1.9 ("Conta Corrente"), desde que constituída(s) a(s) garantia(s) prevista(s) no item "Garantias" desta Cédula.

3. **Utilização do Limite** - O limite será utilizado pelo **Cliente** de uma só vez ou em parcelas, mediante solicitações de transferências de valores da Conta Contratual indicada no subitem 1.2 ("Conta Contratual") para a Conta Corrente, que o **Itaú** atenderá conforme segue:

   3.1. O **Cliente** solicitará as transferências nas agências ou através dos serviços de conveniência do **Itaú**, se contratados pelo **Cliente**.

   3.2. A existência de saldo descoberto na Conta Corrente configurará solicitação de utilização do limite no valor desse saldo, que o **Itaú** atenderá, respeitado o limite disponível, transferindo o valor correspondente da Conta Contratual para a Conta Corrente.

   3.3. A transferência efetuada pelo **Itaú** caracterizará a utilização do limite pelo **Cliente** e o saldo devedor da Conta Contratual corresponderá, em cada momento, ao total dos valores utilizados.

   3.4. O valor do limite poderá ser aumentado a qualquer tempo, a critério do **Itaú**, o que fica desde já autorizado pelo **Cliente** e pelos **Devedores Solidários**.

   3.4.1. O **Cliente** responsabiliza-se pela comunicação do referido aumento de limite aos **Devedores Solidários**.

   3.4.2. **Caso o Cliente ou os Devedores Solidários não concordem com o aumento do limite, deverão comunicar a discordância ao Itaú em até 5 dias a contar da data de aumento do limite para que seja restabelecido o limite anterior. A utilização do limite após esse prazo significará a concordância do Cliente e dos Devedores Solidários com o novo valor do limite.**

   3.5. **A utilização do limite ficará sempre condicionada à constituição e manutenção das garantias nos termos do item "Garantias" desta Cédula e o Itaú só atenderá as solicitações de utilização do limite que estiverem cobertas pelas garantias contratadas.**

The... garantias...nos termos...do item... verification... at https://www...portal...assinaturas... com br 443 is 51ED-DD23-3D20-9547

3.6. **Os extratos das Contas Corrente, Contratual e Vinculada e as planilhas de cálculo fazem parte desta Cédula e os valores deles constantes, apurados de acordo com esta Cédula, são líquidos, certos e determinados. Se o Cliente não concordar com os valores de qualquer extrato ou planilha, deverá comunicar o Itaú, por escrito, e, se não o fizer, em 5 dias a contar do término de vigência desta Cédula, esses documentos constituirão prova documental da utilização, certeza e liquidez do crédito.**

3.7. O limite poderá, a critério do **Itaú**, ser reduzido a qualquer tempo, durante o prazo de vencimento estipulado no subitem 1.5., nas seguintes hipóteses:

    (i)   se o **Cliente** tiver seu nome cadastrado nos órgãos de proteção ao crédito;

    (ii)  verificação de atraso do **Cliente** no pagamento de obrigações perante outras instituições financeiras ou seus fornecedores;

    (iii) aumento do endividamento do **Cliente** em montante incompatível com seu faturamento;

    (iv) existência de ação judicial movida contra o **Cliente** que possa implicar na impossibilidade de cumprimento de suas obrigações ou de manutenção de seu funcionamento ou atividade.

3.8. O **Itaú** colocará à disposição do **Cliente**, mensalmente, planilha de cálculo, na qual evidenciará, para cada período considerado:

    a) o limite;

    b) o saldo devedor diário;

    c) o período de cálculo dos encargos;

    d) a data de débito dos encargos;

    e) o valor total dos encargos cobrados no período, correspondente à soma dos encargos calculados diariamente conforme taxa vigente do dia;

    f) a comissão de abertura de crédito e a data de vencimento do limite;

    g) a alíquota do IOF e o total desse imposto, calculado conforme a legislação;

    h) as tarifas de contratação e de cobrança.

3.9. O **Itaú** colocará à disposição do **Cliente** no **Itaú Empresas na Internet** (*internet banking*) as seguintes informações, relativamente a cada dia do período:

    a) a utilização diária do limite contratual;

    b) a taxa de juros por 30 dias;

    c) a taxa referencial DI-Over (Extragrupo);

    d) a porcentagem sobre a taxa referencial;

    e) a taxa de juros vigente a cada dia;

    f) a taxa efetiva de juros mensal;

    g) a taxa efetiva de juros anual; e

    h) o valor dos encargos diários calculados.

**4. Encargos e Pagamento -** O **Cliente** pagará ao **Itaú** os encargos indicados neste item e, no vencimento do limite, o total dos valores utilizados.

4.1. Mensalmente, no dia indicado no subitem 8, e no vencimento do limite, os juros capitalizados, acumulados no período, calculados diariamente sobre o valor utilizado do limite, mediante a aplicação da taxa obtida pela fórmula a seguir:

$$Taxa = \left[\frac{i_{am}}{100 \times D.U.}\right] + \left[\left(\frac{CDI_{am}}{3000}\right) \times \left(\frac{P}{100}\right)\right]$$

onde:

iam = taxa de juros por 30 dias (subitem 1.7.1)

CDIam = DI-Over (Extragrupo)

P = percentual do DI-Over (Extragrupo) indicado no subitem 1.7.3

D.U. = quantidade de dias úteis do mês.

4.2. Entende-se por (a) "Período de Cálculo dos Encargos": período no qual são calculados os encargos, sendo o primeiro iniciado na data de utilização do Crédito, desde que o limite esteja ativo; (b) "DI - Depósito Interfinanceiro": a aplicação de valores a prazo feita por uma instituição financeira em outra, pré ou pós-fixada; (c) "DI-Over-Cetip": a taxa média dos DI prefixados pactuados entre instituições financeiras que não integrem um mesmo grupo societário, por 1 dia, apurada pelo CETIP (Central de Custódia e de Liquidação Financeira de Títulos ) e publicada pela imprensa.

4.3. Nesta data e nas datas de renovação do limite, o **Cliente** pagará a comissão de abertura de crédito, à taxa do subitem 1.6, incidente sobre o limite indicado no subitem 1.3. Se ocorrer vencimento antecipado desta Cédula, o **Itaú** devolverá ao **Cliente** a comissão proporcional ao período a decorrer entre a data do vencimento antecipado e a data de vencimento acordada.

4.4. **O Itaú poderá repassar ao Cliente o valor de tributos e encargos que venham a ser criados ou aumentados, exigíveis em razão desta Cédula, mediante informação prévia ao Cliente.**

4.5. O **Cliente** pagará o imposto sobre operações financeiras (IOF) conforme a legislação em vigor.

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Kudzit, JUCESP registration number at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.

1ª VIA (NEGOCIÁVEL): ITAÚ UNIBANCO; 2ª VIA (NÃO NEGOCIÁVEL): CLIENTE; DEMAIS VIAS (NÃO NEGOCIÁVEIS): OUTROS INTERVENIENTES

4.6. O **Cliente** reconhece a taxa referencial indicada no subitem 1.7.3 como legítima, publicamente divulgada e regularmente calculada de forma imparcial. Na hipótese de extinção, limitação, não divulgação, proibição legal ou judicial de utilização da taxa DI-OVER (Extragrupo), será utilizada a taxa SELIC (Sistema Integrado de Liquidação e Custódia), fixada pelo Conselho de Política Monetária - COPOM e divulgada pelo Banco Central do Brasil - BACEN.

## 5. Modo de Pagamento - O **Cliente** pagará ao **Itaú**:

a) juros e demais encargos mediante débito que o **Itaú** fará na Conta Corrente; e;

b) no vencimento do limite, os valores utilizados, mediante transferência que o **Itaú** fará da Conta Corrente para a Conta Contratual.

5.1. O **Cliente**, desde já, autoriza o **Itaú** a efetuar os débitos acima na Conta Corrente, que deverá ter saldo disponível suficiente. A insuficiência de saldo disponível na Conta Corrente configurará atraso no pagamento e autoriza o **Itaú**, a seu critério, a fazer a transferência ou o débito gerando adiantamento a depositante, nos termos do Contrato de Abertura da Conta Corrente.

## 6. Devedores Solidários - As pessoas ao final nomeadas, designadas **Devedores Solidários**, declaram-se solidariamente responsáveis pelas obrigações delo **Cliente** nesta Cédula.

## 7. Garantias - Para garantir o pagamento de qualquer valor relacionado a esta Cédula, são constituídas as seguintes garantias:

7.1. Cessão fiduciária dos seus créditos, atuais e futuros, perante as **Credenciadoras** ou **Subcredenciadoras**, decorrentes de transações de aquisição de produtos e serviços oferecidos em seus pontos de venda e pagos com o uso dos cartões de crédito ou de débito das Bandeiras indicadas no Termo de Autorização de Manutenção de Domicílio Bancário, anexo a esta Cédula ("**Recebíveis**").

7.1.1. Entende-se por: (a) "**Bandeiras**": bandeiras processadas pelas **Credenciadoras** ou **Subcredenciadoras** conforme informadas no Termo de Autorização de Manutenção de Domicílio Bancário; e (b) "**Credenciadoras** ou **Subcredenciadoras**": qualquer pessoa jurídica que credencia pessoas para aceitação de cartões de crédito e/ou débito das Bandeiras como meio de pagamento na aquisição de bens e/ou serviços e que disponibiliza solução tecnológica e/ou meios de conexão aos sistemas das pessoas credenciadas para captura e liquidação de transações efetuadas com os referidos cartões.

7.1.2. O **Cliente** obriga-se a solicitar imediatamente ao banco detentor do domicílio bancário dos **Recebíveis**, no caso de alteração do referido domicílio, a devida liberação perante a entidade responsável pelo registro dos domicílios bancários para pagamento dos **Recebíveis**, da manutenção de domicílio bancário constituída em favor daquele banco, liberação esta que deverá estar concluída no prazo de 30 dias a contar da data desta Cédula.

7.1.3. O **Cliente** manterá o domicílio bancário inalterado até a liquidação de todas as obrigações desta Cédula e não poderá solicitar sua alteração a nenhuma das **Credenciadoras** ou **Subcredenciadoras**, ou à entidade responsável pelo registro dos domicílios bancários para pagamento dos **Recebíveis** sem expressa anuência do **Itaú**.

7.1.4. A anuência do **Itaú** à alteração do domicílio bancário produzirá efeitos dêem até 5 dias úteis da data da aceitação pelo **Itaú**.

7.1.5. Se alguma das **Credenciadoras** ou **Subcredenciadoras**, fizer antecipação de pagamento dos **Recebíveis**, essa antecipação será feita exclusivamente por meio de crédito na Conta Vinculada.

7.1.6. **Na vigência desta Cédula o Cliente não poderá dar os Recebíveis em garantia de outras operações de crédito, exceto para operações firmadas com o Itaú, nem recusar, limitar ou restringir o uso dos cartões referidos no subitem 7.1 para pagamento dos produtos e serviços que fornecer.**

7.1.7. Até a integral liquidação do saldo devedor decorrente desta Cédula, o valor dos **Recebíveis** ainda não pagos (agendas), conforme informados pelas **Credenciadoras** ou **Subcredenciadoras** somado ao saldo da Conta Vinculada deverá totalizar montante igual ao Valor Mínimo da Garantia, que corresponderá ao valor equivalente ao saldo devedor total decorrente desta Cédula.

7.1.7.1. O **Itaú** somente liberará ao **Cliente** os valores creditados na Conta Vinculada, creditando-os na Conta Corrente, se: (i) o **Cliente** encontrar-se adimplente com todas as obrigações decorrentes desta Cédula; (ii) o montante dos **Recebíveis** ainda não pagos (agendas) seja suficiente para atender ao Valor Mínimo da Garantia, após referida liberação; e (iii) não haja saldo devedor na Conta Contratual.

This public translation

7.1.7.2. Caso não se verifiquem as hipóteses descritas acima, o **Itaú** fica autorizado a manter os valores provenientes do pagamento dos **Recebíveis** na Conta Vinculada em montante suficiente para que tais valores, somados ao valor dos **Recebíveis** ainda não pagos (agendas), passe a corresponder ao Valor Mínimo da Garantia.

7.1.7.3. Os valores depositados na Conta Vinculada que, após a retenção prevista acima, excederem ao Valor Mínimo da Garantia serão liberados pelo **Itaú** para o **Cliente**.

7.1.7.4. Caso, por qualquer motivo, alguma das **Credenciadoras** ou **Subcredenciadoras**, não enviar a informação do montante dos **Recebíveis** ainda não pagos (agenda) que serão por ela repassados ao **Cliente** em determinado período, o cálculo do Valor Mínimo da Garantia será efetuado considerando apenas as informações quanto ao montante dos **Recebíveis** ainda não pagos (agendas) efetivamente enviadas pelas demais **Credenciadoras** ou **Subcredenciadoras.**

7.1.7.5. **Caso o Cliente não possua saldo na Conta Vinculada correspondente ao montante igual ao Valor Mínimo de Garantia na data de assinatura desta Cédula, o Cliente deverá complementar este valor até que seja alcançado o Valor Mínimo de Garantia.**

7.1.8. Os valores relativos à liquidação ou antecipação de pagamento dos **Recebíveis** creditados na Conta Vinculada serão transferidos pelo **Itaú** para a Conta Corrente e desta para a Conta Contratual, para a amortização ou liquidação do saldo devedor dessa conta contratual.

7.1.8.1. O **Itaú** poderá manter o saldo da Conta Vinculada aplicado; nessa hipótese, os direitos sobre a aplicação e os rendimentos auferidos pela aplicação integrarão a garantia.

7.2. Outras garantias adicionais, se exigidas pelo **Itaú**, prestadas por meio de documentos anexos, parte integrante desta Cédula.

7.3. O **Itaú** assegura ao Cliente a livre movimentação dos recursos financeiros provenientes de operações de antecipação de recebíveis celebradas com instituições credenciadoras e subcredenciadores, até o limite diário correspondente ao excesso do valor da agenda de recebíveis em relação ao Valor Mínimo da Garantia, o qual poderá ser consultado no Portal Itaú 30 Horas.

7.3.1. Os recursos financeiros provenientes de operações de antecipação que não sejam de livre movimentação, poderão ser retidos pelo **Itaú** por até **dois dias úteis**, ou no maior prazo legalmente autorizado, após os quais tais recursos deverão ser liberados ao **Cliente** ou utilizados para amortização de saldo devedor da operação.

7.4. O cliente autoriza o **Itaú** a informar às instituições credenciadoras e aos subcredenciadores: (a) a contratação de operações de crédito garantidas por recebíveis de arranjo de pagamento, incluindo os dados necessários para realização da liquidação financeira desses recebíveis na instituição domicílio indicada no respectivo contrato, durante sua vigência; (b) o encerramento de contratos de operações de crédito garantidas por recebíveis de arranjo de pagamento no prazo legal.

8. **Vencimento e Renovação do Limite** – O limite vigorará até a data do subitem 1.5. O **Itaú** , a seu critério, poderá renovar o limite. Nessa hipótese, até a data do subitem 1.5, colocará à disposição do **Cliente** e dos **Devedores Solidários**, na agência citada no subitem 1.9, ou nos terminais de autoatendimento, informações sobre as seguintes condições específicas desta Cédula, que continuará a reger-se também pelas outras cláusulas aqui previstas:

a) o limite;

b) a taxa de juros para o dia da renovação;

c) o valor da comissão de abertura de crédito;

d) a data da renovação do limite;

e) a data de vencimento.

8.1. **Os Devedores Solidários concordam com a renovação do limite até o valor indicado no subitem 1.3 ou até o valor limite aumentado conforme previsto no subitem 3.4 e que os valores utilizados após a renovação estejam sujeitos à taxa de juros equivalente, no máximo, à maior taxa informada pelo Banco Central do Brasil, na data da renovação, para operação desta mesma natureza.**

This public translator certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.

8.2. A cada renovação do limite, as condições contratuais do item 1 serão alteradas pelos novos dados que o **Itaú** informará ao **Cliente**.

8.3. **Se o Cliente ou os Devedores Solidários não optarem pela renovação do limite ou não concordarem com as condições informadas para sua renovação, devem comunicar a discordância ao Itaú em até 5 dias após a data de vencimento do limite e, imediatamente, liquidar o saldo devedor, calculado conforme as condições anteriormente em vigor. A utilização do limite após esse prazo significará a concordância do Cliente e dos Devedores Solidários com as condições de renovação do limite.**

9. **Atraso de Pagamento e Multa** - Sem prejuízo da possibilidade de vencimento antecipado, se houver atraso no pagamento de obrigação desta Cédula, incidirão sobre os valores devidos e não pagos juros remuneratórios do subitem 1.7, acrescidos de juros moratórios de 1% ao mês, calculados de forma pro rata e capitalizados diariamente, desde a data de vencimento da obrigação até a data de seu efetivo pagamento e multa de 2%.

9.1. No caso de cobrança judicial ou extrajudicial, a parte inadimplente pagará à parte credora despesas de cobrança, inclusive custas e honorários advocatícios.

9.2. O inadimplemento do **Cliente** autoriza o **Itaú** a promover a imediata execução desta Cédula e a excussão das respectivas garantias.

9.3. **O Itaú poderá compensar quaisquer créditos que tenha em face do Cliente ou dos Devedores Solidários com créditos que o Cliente ou os Devedores Solidários tenham perante o Itaú.**

9.4. **O Cliente e os Devedores Solidários, neste ato, de forma irretratável e irrevogável, autorizam o Itaú a debitar de quaisquer Contas Correntes por eles mantidas junto ao Itaú, até quando os fundos comportarem, todas as quantias que sejam devidas ao Itaú por força desta Cédula.**

10. **Vencimento Antecipado** - O Itaú poderá considerar antecipadamente vencidas as obrigações decorrentes desta Cédula e reduzir ou encerrar o limite, na ocorrência de qualquer dos seguintes casos:

a) inadimplemento de qualquer obrigação decorrente desta Cédula ou de qualquer instrumento celebrado pelo **Cliente** com o **Itaú** ou com qualquer sociedade controlada, direta ou indiretamente, pela **Itaú Unibanco Holding S.A.**;

b) se o **Cliente** tiver requerida ou decretada sua falência, propuser recuperação judicial ou extrajudicial, for dissolvido ou sofrer protesto de título por cujo pagamento seja responsável;

c) morte, insolvência, interdição de qualquer um dos **Devedores Solidários**, ou ocorrência de qualquer dos eventos descritos no item (b) em relação a qualquer dos **Devedores Solidários**, sem apresentação de substituto aceito pelo **Itaú**, no prazo de 15 dias da ocorrência do evento;

d) se as garantias desta Cédula ou de seus anexos, não forem efetivadas ou formalizadas ou se tais garantias se tornarem impróprias ou insuficientes para assegurar as obrigações desta Cédula e não forem substituídas no prazo de 15 dias de comunicação do **Itaú**;

e) houver sentença transitada em julgado em razão de prática, pelo **Cliente, Devedores Solidários** ou administradores do **Cliente** ou dos **Devedores Solidários**, de atos que importem em discriminação de raça ou de gênero, trabalho infantil, trabalho escravo, assédio moral ou sexual ou crime contra o meio ambiente;

f) se ocorrer qualquer processo de reorganização societária ou de alteração de controle, direito ou indireto, em que o **Cliente** esteja envolvido.

g) alteração do objeto social ou da atividade principal do **Cliente** ou alienação de estabelecimento comercial ou de parcela significativa de bens ou direitos de seu ativo permanente.

h) se o **Cliente** for acionado judicialmente por não pagamento de dívida.

i) solicitação, pelo **Cliente,** do encerramento da Conta Corrente mantida no **Itaú.**

j) no caso de superveniência de norma ou regulamentação que impeça a continuidade da vigência desta Cédula.

10.1. O **Cliente** obriga-se a comunicar ao **Itaú**, imediatamente, a ocorrência de qualquer dos eventos descritos nos itens (b), (c), (e), (f) ou (g), acima.

**11. Tarifas -** Pelo processamento desta operação e das renovações do limite e da movimentação entre as contas mencionadas nesta Cédula, o **Cliente** pagará a tarifa prevista na Tabela de Tarifas, afixada nas agências do **Itaú**, em vigor nesta data e nas datas de renovação do limite.

**12. Divulgação de Atraso no Pagamento -** Caso não seja verificado o pagamento na data do vencimento, o **Itaú** poderá comunicar o fato à SERASA, ao SPC e a qualquer órgão encarregado de cadastrar atraso de pagamento e descumprimento de obrigação contratual.

**13. Sistema de Informações de Crédito (SCR) -** O **Cliente** e os **Devedores Solidários** autorizam, a qualquer tempo, mesmo após o término deste Contrato, o **Itaú**, as sociedades do Conglomerado Itaú Unibanco e as demais instituições aptas a consultar o SCR nos termos da regulamentação e que adquiram, recebam ou manifestem interesse em adquirir ou de receber em garantia, total ou parcialmente, operações de crédito de responsabilidade do **Cliente** e dos **Devedores Solidários** ("Instituições Autorizadas"), a consultar no SCR informações a seu respeito.

13.1. O SCR é constituído por informações remetidas ao Banco Central do Brasil (BACEN) sobre operações de crédito, nos termos da regulamentação. A sua finalidade é prover ao BACEN informações para monitoramento do crédito no sistema financeiro e fiscalização, além de viabilizar o intercâmbio de informações entre instituições financeiras.

13.1.1. O **Cliente** e os **Devedores Solidários** declaram-se cientes de que as consultas ao SCR serão realizadas com base na presente autorização e que as sociedades do Conglomerado **Itaú Unibanco** poderão trocar entre si as informações do **Cliente** e dos **Devedores Solidários** constantes do seu cadastro.

13.1.2. O **Cliente** e os **Devedores Solidários** declaram, ainda, ciência de que os dados sobre o montante das suas dívidas a vencer e vencidas, inclusive em atraso e baixadas com prejuízo, bem como o valor das coobrigações que tenham assumido e das garantias que tenham prestado serão fornecidos ao BACEN e registrados no SCR, valendo essa declaração como comunicação prévia desses registros.

13.1.3. O **Cliente** e os **Devedores Solidários** poderão ter acesso, a qualquer tempo, aos seus dados no SCR pelos meios disponibilizados pelo BACEN, inclusive seu *site* e, em caso de divergência, pedir sua correção, exclusão ou registro de manifestação de discordância, bem como cadastramento de medidas judiciais, mediante solicitação à central de atendimento da instituição que efetivou o registro dos dados no SCR.

**14. Responsabilidade Ambiental -** O **Cliente** e os **Devedores Solidários** declaram que, nesta data e durante a vigência desta Cédula: (a) respeitam e respeitarão a legislação trabalhista relativa à saúde ou segurança ocupacional, inclusive quanto a trabalho escravo ou infantil; (b) suas atividades e propriedades estão e estarão em conformidade com a legislação ambiental brasileira, inclusive quanto à Lei de Biossegurança; e (c) os recursos decorrentes desta Cédula serão destinados apenas a finalidades lícitas que atendam rigorosamente à legislação aqui mencionada.

14.1. O **Cliente** e os **Devedores Solidários** apresentarão ao **Itaú**, quando solicitado, os documentos exigidos pela legislação ambiental e trabalhista vigentes, com o fim de atestar o regular desempenho de suas atividades.

14.2. Independentemente de culpa, o **Cliente** e os **Devedores Solidários** ressarcirão o **Itaú** de qualquer quantia que este seja compelido a pagar, e o indenizarão por quaisquer perdas e danos referentes a danos ambientais ou relativos a saúde e segurança ocupacional que a autoridade entenda estar relacionado à utilização dos recursos decorrentes desta Cédula.

**15. Combate e Prevenção à Lavagem de Dinheiro e à Corrupção –** O **Cliente** declara conhecer e respeitar a legislação de prevenção à lavagem de dinheiro e financiamento ao terrorismo e de atos de corrupção e lesivos contra a administração pública nacional e estrangeira e comunicará imediatamente ao **Itaú** caso tenha ciência de qualquer ato ou fato relacionado a esta Cédula que viole normas, podendo o **Itaú** tomar as providências que entender necessárias.

**16. Despesas -** O **Cliente** pagará todas as despesas decorrentes do registro desta Cédula e de seus anexos, mediante débito na Conta Corrente, em valor informado pelo **Itaú** com 5 dias de antecedência.

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.                    Página 48 de 55

23635-6 (FL 6/8) GJNE – 05/19                    1ª VIA (NEGOCIÁVEL): ITAÚ UNIBANCO; 2ª VIA (NÃO NEGOCIÁVEL): CLIENTE; DEMAIS VIAS (NÃO NEGOCIÁVEIS): OUTROS INTERVENIENTES

17. **Custo Efetivo Total ("CET")** - declara que tomou ciência do Custo Efetivo Total ("CET") previamente à contratação desta operação, expresso na forma de taxa percentual anual, indicado na planilha anexa. Para o cálculo do CET são considerados: (a) o valor do limite; (b) o prazo da operação, estimado em 30 dias; e (c) a taxa de juros remuneratórios, o valor dos tributos, das tarifas bancárias e das demais despesas previstas nesta Cédula. O CET foi calculado para a hipótese de utilização integral do limite pelo prazo estimado de 30 dias, se isso não ocorrer, o CET será inferior.

18. **Declaração de Leitura** - O **Cliente** e os **Devedores Solidários** declaram que leram esta Cédula e que não possuem nenhuma dúvida com relação a quaisquer de suas cláusulas.

19. **Foro** - Fica eleito o Foro da Comarca do local de emissão desta Cédula, podendo a parte que promover a ação optar pelo Foro do domicílio do **Cliente**.

20. **Envio de Comunicações** - O **Cliente** autoriza, desde já, o envio de comunicações relativas a produtos e serviços do **Itaú**, inclusive por meio de e-mails e mensagens de telefone celular. A presente autorização poderá ser cancelada a qualquer tempo mediante solicitação à Central de Atendimento do **Itaú**. Por questões de segurança, o **Itaú** sempre poderá enviar mensagens e informações referentes à suspeita de fraude, cheques devolvidos, concessão de adiantamento à depositante e transações negadas. Para tais comunicações serão utilizados o número de telefone celular e o e-mail constantes no cadastro atualizado.

21. **Cessão** - O **Cliente** e os **Devedores Solidários** declaram-se cientes de que o **Itaú** poderá, a qualquer tempo, ceder esta operação, total ou parcialmente, para empresa sob controle direto ou indireto do **Itaú** Unibanco Holding S.A., bem como para terceiros.

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.            Página 49 de 55

23635-6 (FL 7/8) GJNE – 05/19            1ª VIA (NEGOCIÁVEL): ITAÚ UNIBANCO, 2ª VIA (NÃO NEGOCIÁVEL): CLIENTE; DEMAIS VIAS (NÃO NEGOCIÁVEIS): OUTROS INTERVENIENTES

Local e data indicados na primeira página desta Cédula.

**Cliente** (qualificado na primeira página desta Cédula)

Assinatura(s): _~~~~~~~~~~~~~~~~~~~~~~~~~~~_
Nome(s) do(s) Representante(s) Legal(is) (por extenso):

**Devedores Solidários:**

1)_____     2)_____
   Nome:                            Nome:
   CPF/CNPJ:                        CPF/CNPJ:
   Fone:                            Fone:
   Endereço:                        Endereço:

> Itaú
> A B O N A D O
> SÃO PAULO

3)_____     4)_____
   Nome:                            Nome:
   CPF/CNPJ:                        CPF/CNPJ:
   Fone:                            Fone:
   Endereço:                        Endereço:

> FORMALIZAÇÃO - ITAU
> FEITO | CONFERIDO
> Dmc

**Solução Amigável de Conflitos** - Consultas, informações e serviços transacionais acesse www.itau.com.br ou ligue 0300 100 7575, em dias úteis, das 8h às 20h ou fale com seu gerente. Reclamações, cancelamentos e informações gerais ligue para o SAC: 0800 728 0728, todos os dias, 24 horas por dia. Se não ficar satisfeito com a solução apresentada, de posse do protocolo, contate a Ouvidoria: 0800 570 0011, em dias úteis, das 9h às 18h. Deficiente auditivo/fala: 0800 722 1722, todos os dias, 24 horas por dia.

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1690, the

23635-6 (FL 8/8) GJNE - 05/19          1ª VIA (NEGOCIÁVEL): ITAÚ UNIBANCO; 2ª VIA (NÃO NEGOCIÁVEL): CLIENTE; DEMAIS VIAS (NÃO NEGOCIÁVEIS): OUTROS INTERVENIENTES

 **Itaú Unibanco S.A.**     **AUTORIZAÇÃO PARA ALTERAÇÃO E MANUTENÇÃO DE DOMICÍLIO BANCÁRIO**

---

### 1. Dados do Cliente

| 1.1. Nome empresarial | 1.2. CNPJ Nº |
|---|---|
| RAKUTEN BRASIL FINANCIAL SERVI | 22.366.799/0001-77 |

### 2. Dados desta autorização

2.1. Domicílio bancário a ser mantido

| 2.1.1 Banco | 2.1.2 Agência | 2.1.3 Conta n.º | 2.1.4. Bandeira |
|---|---|---|---|
| 341 | 7307 | 15401-8 | Master |
| | | | VISA |

2.2. Bandeiras:

( X ) Mastercard, Mastercard Maestro, Redeshop,  e outras bandeiras processadas pelas Credenciadoras que sejam por elas informadas ao **Itaú**;

(   ) Visa, Visa Electron e outras bandeiras processadas pelas **Credenciadoras** que sejam por elas informadas ao **Itaú**.

2.3. Prazo desta autorização
ATÉ FINAL E INTEGRAL LIQUIDAÇÃO DA OPERAÇÃO GARANTIDA

2.4. Data e local de emissão   06/08/2019 - SÃO PAULO,SP

3. O **Cliente** identificado no item 1 autoriza o **Itaú Unibanco S.A.**, com sede na Praça Alfredo Egydio de Souza Aranha, nº 100 - Torre Olavo Setúbal, São Paulo, SP, CNPJ n.º 60.701.190/0001-04 ("**Itaú**"), a:

(i) notificar a **Centralizadora**, qualificada no subitem 6.1, de que o **Cliente** formalizou operação financeira  com o **Itaú** vinculada a seus direitos de crédito, presentes e futuros, decorrentes de todas as transações com cartões de crédito e/ou débito das Bandeiras indicadas no subitem 2.2;

(ii) alterar, quando for o caso, o domicílio bancário atualmente vigente para o novo domicílio bancário indicado no subitem 2.1;

(iii) solicitar à **Centralizadora** a manutenção do domicílio bancário indicado no subitem 2.1, a partir desta data e até a data do subitem 2.3, relativamente à(s) espécie(s) de transação(ões) de crédito e débito, relativas às Bandeiras indicadas no subitem 2.2.

(iv) caso esse domicílio bancário esteja vinculado a cadeia centralizadora do **Cliente** (centralização do fluxo dos direitos de crédito de mais de uma pessoa jurídica do mesmo grupo societário e/ou econômico do **Cliente** em apenas um Domicílio Bancário), adotar todas as medidas necessárias perante a **Centralizadora** para a manutenção de todos os demais domicílios bancários do **Cliente** que estejam relacionados à mesma cadeia centralizadora, ainda que esses domicílios bancários não tenham sido expressamente indicados nesta autorização ou, na impossibilidade da manutenção de todos os domicílios bancários, solicitar à **Centralizadora** o desmembramento da cadeia centralizadora, para que seja possível a manutenção de domicílio bancário aqui indicada;

(v) adotar todas as medidas necessárias perante a **Centralizadora** para a manutenção de todos os domicílios bancários do **Cliente** que tenham os mesmos CNPJs (informados no Anexo I) no sistema da **Centralizadora**;

(vi) ter acesso a suas informações perante as **Credenciadoras** ou a **Centralizadora** relativas às transações débito e/ou transações crédito das Bandeiras indicadas no subitem 2.2; e

(vii) fornecer às **Credenciadoras** e à **Centralizadora** todas as informações e documentos relativos à operação financeira que ensejou esta autorização;

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.

**(viii)** se a operação financeira celebrada pelo **Cliente** puder ser renovada ou tiver seu vencimento em data superior a 36 (trinta e seis) meses, solicitar à **Centralizadora** a renovação da manutenção de domicílio bancário quantas vezes forem necessárias, até integral liquidação da operação financeira, independentemente da formalização de novo termo de autorização;

**(ix)** quando a manutenção de domicílio bancário prevista nesta autorização for constituída em conta vinculada a operação financeira contratada com o **Itaú**, solicitar à **Centralizadora**, a alteração do domicílio bancário para uma conta corrente de livre movimento, de sua titularidade, à qual a conta vinculada está relacionada;

**(x)** quando a manutenção de domicílio bancário prevista nesta autorização for constituída em conta corrente de livre movimento, solicitar à **Centralizadora** a alteração do domicílio bancário para uma conta vinculada a essa conta corrente, relacionada à operação financeira contratada com o **Itaú.**

4. Na hipótese de resilição ou rescisão de algum dos **Contratos de Credenciamento**, o **Cliente** autoriza a respectiva **Credenciadora** a continuar a efetuar o depósito dos créditos indicados no item 2 no domicílio bancário indicado no subitem 2.1 até a data indicada no subitem 2.3.

5. O **Cliente** e o **Itaú** reconhecem que: (a) a assinatura desta autorização é condição para que as **Credenciadoras** cumpram, concomitantemente, o **Contrato de Credenciamento** e o Contrato de Manutenção de Domicílio Bancário celebrado entre cada **Credenciadora** e **Itaú**; e (b) as **Credenciadoras** poderão exigir o cumprimento das obrigações aqui constantes nos termos dos artigos 436 e 437 do Código Civil.

6. O **Cliente** declara-se ciente de que:

**(i)** a manutenção de domicílio bancário indicada nesta autorização vinculará todas as transações relativas às Bandeiras indicadas no subitem 2.2, independentemente da **Credenciadora** responsável pela captura, pelo processamento e pela liquidação das referidas transações;

**(ii)** a manutenção de domicílio bancário, quando realizada com base na raiz do CNPJ (nove primeiros dígitos), vinculará automaticamente todos os demais números de CNPJ que contenham a mesma raiz e não tenham manutenção de domicílio bancário anterior;

**(iii)** na hipótese do item anterior, caso seja criado um novo CNPJ que contenha a mesma raiz aqui indicada, esse novo CNPJ também ficará vinculado a esta autorização;

**(iv)** as **Credenciadoras**, até a data do subitem 2.3, não celebrarão operação que vise a antecipação de créditos de ponto de venda cujo domicílio bancário esteja sujeito à manutenção, nos termos aqui indicados, salvo mediante prévia e expressa autorização do **Itaú;**

**(v)** transações de crédito e débito de qualquer das Bandeiras indicadas no subitem 2.2 poderão ser capturadas por uma mesma **Credenciadora**, por intermédio de um mesmo **Equipamento;**

**(vi)** a manutenção de domicílio bancário prevista nesta autorização será processada pelo **Itaú**, pelas **Credenciadoras** e pela **Centralizadora** em conformidade com as disposições da Convenção para Regulamentação e Proteção de Garantias de Recebíveis – "Sistema de Controle de Garantias", cujos termos e condições o **Cliente** declara conhecer.

6.1. Para os fins desta autorização, entende-se por: (a) **Credenciadora:** qualquer pessoa jurídica que credencia pessoas físicas ou jurídicas para aceitação de cartões de crédito ou débito como meios eletrônicos de pagamento na aquisição de bens ou serviços e que disponibiliza solução tecnológica ou meios de conexão aos sistemas dos credenciados para fins de captura e liquidação das transações efetuadas por meio de cartões de crédito ou débito; (b) **Equipamentos:** terminais eletrônicos ou outros aparelhos, dispositivos, sistemas de informática, programas de computador, utilizados pelo **Cliente**, para possibilitar a realização de transações de crédito e/ou débito; e (c) **Centralizadora:** Câmara Interbancária de Pagamentos – CIP - entidade responsável pela centralização do registro, processamento e transmissão de informações relativas à manutenção de domicílio bancário.

7. Uma vez assinada esta autorização, o **Itaú** poderá solicitar à **Centralizadora**, a partir desta data, a manutenção do domicílio bancário indicado no subitem 2.1, sendo responsável perante o **Cliente** pelo envio das informações relacionadas a tal manutenção de domicílio bancário.

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.

**8.** A manutenção de domicílio bancário somente poderá ser cancelada antes da data indicada no subitem 2.3 mediante notificação do **Itaú** à **Centralizadora. A** partir do dia útil seguinte ao cancelamento da manutenção de domicílio bancário conforme autorização do **Itaú,** ou da data de vencimento indicada no subitem 2.3, o **Cliente** poderá solicitar às **Credenciadoras** a alteração do domicílio bancário indicado no subitem 2.1.

**Cliente** RAKUTEN BRASIL FINANCIAL SERVI

Dados dos representantes do **Cliente:**

Nome:_____    Nome:_____

CPF: _____ RG: _____    CPF: _____ RG: _____

Cargo: _____    Cargo: _____



This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.

**ANEXO I À AUTORIZAÇÃO PARA ALTERAÇÃO E MANUTENÇÃO DE DOMICÍLIO BANCÁRIO**
**RELAÇÃO DE CNPJS VINCULADOS**

| | |
|---|---|
| 22.366.799/0001-77 | |

This public translation certificate was digitally signed by the Official Translator Sandra Regina Mattos Rudzit, JUCESP 1688. The verification code at https://www.portaldeassinaturas.com.br:443 is 51ED-DD23-3D20-9547.

24254-5 (FL 4/4) 01/15                                   1ª via: Itaú - 2ª via: Cliente



# 4º Oficial de Registro de Títulos e Documentos e
# Civil de Pessoa Jurídica da Comarca de São Paulo

*Oficial de Registro: Robson de Alvarenga*

Rua Quinze de Novembro, 251 - 5º Andar - Centro
Tel.: (11) 37774040 - Email: contato@4rtd.com.br - Site: www.4rtd.com.br

## REGISTRO PARA FINS DE
## PUBLICIDADE E EFICÁCIA CONTRA TERCEIROS

## Nº 5.379.823 de 04/10/2019

**Certifico e dou fé** que o documento em papel, contendo **28 (vinte e oito) páginas**, foi apresentado em 04/10/2019, o qual foi protocolado sob nº 290.775, tendo sido registrado eletronicamente sob nº **5.379.823** no Livro de Registro B deste 4º Oficial de Registro de Títulos e Documentos da Comarca de São Paulo, na presente data.

**Natureza:**
CEDULA DE CREDITO

São Paulo, 04 de outubro de 2019

### ( ASSINADO ELETRONICAMENTE )

Carlos Augusto Peppe
Escrevente

Este certificado é parte **integrante e inseparável** do registro do documento acima descrito.

| Emolumentos | Estado | Secretaria da Fazenda | Registro Civil | Tribunal de Justiça |
|---|---|---|---|---|
| R$ 8.671,83 | R$ 2.464,63 | R$ 1.686,89 | R$ 456,41 | R$ 595,16 |
| Ministério Público | ISS | Condução | Outras Despesas | Total |
| R$ 416,24 | R$ 181,76 | R$ 0,00 | R$ 0,00 | R$ 14.472,92 |



Para verificar o conteúdo integral do documento, acesse o site:
**servicos.cdtsp.com.br/validarregistro**
e informe a chave abaixo ou utilize um leitor de qrcode.

0018194134588030384



Para conferir a procedência deste documento efetue a leitura do QR Code impresso ou acesse o endereço eletrônico:
**https://selodigital.tjsp.jus.br**

1134804TIFC000073077BC19F



# PROTOCOLO DE ASSINATURA(S)

In order to verify the signature, click here https://www.portaldeassinaturas.com.br/Verificar/51ED-DD23-3D20-9547 or visit https://www.portaldeassinaturas.com.br:443 and use the code below to check if this document is valid.

## Código para verificação: 51ED-DD23-3D20-9547



**Hash do Documento**

B2B5F1DE0D19C3C202F3BC4B17BDBF3F4312304B0A86157EE902629BD6FD446E

O(s) nome(s) indicado(s) para assinatura, bem como seu(s) status em 16/09/2021 é(são) :

☑ Sandra Regina Mattos Rudzit (Signatário) - 082.060█████08  em
16/09/2021 14:20 UTC-03:00
**Tipo:** Certificado Digital

